# In the United States Court of Appeals
# For the Eighth Circuit

No. 23-2744
In re: T-Mobile Customer Data Security Breach Litigation
----------------------------

Veera Daruwalla, Washington Western, 2:23-cv-01118, et al.
*Plaintiffs - Appellees,*
v.
T-Mobile US, Inc. and T-Mobile USA, Inc.,

Cassie Hampe; et al.,
*Objector – Appellant*

(caption continued on inside cover)

## PLAINTIFFS – APPELLEES' CONSOLIDATED BRIEF

Norman E. Siegel
STUEVE SIEGEL HANSON LLP
460 Nichols Rd., Ste. 200
Kansas City, MO 64112
siegel@stuevesiegel.com

Cari Campen Laufenberg
KELLER ROHRBACK L.L.P.
1201 3rd Ave., Ste. 3200
Seattle, WA 98101
claufenberg@kellerrohrback.com

James J. Pizzirusso
HAUSFELD LLP
888 16th St. NW, Ste. 300
Washington, DC 20006
jpizzirusso@hausfeld.com

*Attorneys for Plaintiffs – Appellees*

*(Additional Counsel Listed Below)*

No. 23-2798
In re: T-Mobile Customer Data Security Breach Litigation

----------------------------

Veera Daruwalla, Washington Western, 2:23-cv-01118, et al.
*Plaintiffs - Appellees,*

v.

T-Mobile US, Inc. and T-Mobile USA, Inc.,

John Jabob Pentz, III, as representative to the Estate of Connie Pentz
*Objector – Appellant*


On Appeal from the United States District Court for the Western
District of Missouri (Kansas City)
Case No. 4:21-md-03019-BCW
District Judge Brian C. Wimes

## SUMMARY OF THE CASE

Appellants Cassie Hampe and Connie Pentz, acting as stand-ins for attorney relatives who routinely make bad-faith objections to class-action settlements, objected to the settlement below. After briefing and a lengthy hearing, the district court struck Cassie Hampe's objection based on her law firm's long history of making meritless objections to extort unearned compensation. It also struck Connie Pentz's objection as a discovery sanction. Nevertheless, the court considered the substance of the objectors' arguments when evaluating the attorneys' fees request, and after extensive analysis, awarded a 22.5% fee of the $350 million settlement fund secured by Class counsel. That fee—a third below the percentage commonly awarded in this Circuit—was justified by the district court's finding that the settlement provided the Class with extraordinary and expedient relief.

Any appeal of the district court's order striking Connie Pentz's objection was waived below. The record is undisputed on this point, rendering oral argument unnecessary. As to Cassie Hampe's appeal, to the extent the Court believes oral argument is useful, Plaintiffs-Appellees submit that 10 minutes for each side is sufficient.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ....................................................................i

TABLE OF CONTENTS ......................................................................ii

TABLE OF AUTHORITIES................................................................iv

STATEMENT OF ISSUES................................................................ 1

STATEMENT OF CASE .................................................................. 3

I.    CLASS COUNSEL OBTAINED AN EXCELLENT SETTLEMENT FOR THE CLASS. ................................................. 3

II.    CASSIE HAMPE'S AND CONNIE PENTZ'S OBJECTIONS TO CLASS COUNSEL'S FEE REQUEST WERE STRICKEN. .................................................................................. 9

        A.    The District Court Struck Hampe's Objection Because It Was Made In Bad-Faith. .................................... 10

        B.    The District Court Struck Connie Pentz's Objection As A Discovery Sanction. ......................................... 16

III.    APPLYING THIS COURT'S WELL-ESTABLISHED PRECEDENT GOVERNING FEE AWARDS, THE DISTRICT COURT APPROVED THE SETTLEMENT AND AWARDED ATTORNEYS' FEES. ........................................... 20

SUMMARY OF THE ARGUMENT .................................................. 28

ARGUMENT ................................................................................... 34

I.    APPELLANTS ARE NOT PROPER PARTIES TO APPEAL THE FEE AWARD. .......................................................... 34

        A.    To Appeal, Appellants Must Show the District Court Abused its Discretion in Striking Their Objections. ........... 34

        B.    The District Court Did Not Abuse its Discretion in Striking the Objections. ...................................... 36

1. Connie Pentz waived any challenge to her objection being stricken. ...............................37

2. Hampe fails to show the district court erred in striking her objection. ...................................41

II. EVEN IF THEIR ARGUMENTS ARE CONSIDERED, APPELLANTS FAIL TO SHOW THE DISTRICT COURT ABUSED ITS DISCRETION IN AWARDING ATTORNEYS' FEES...........................................................................48

A. This Court Reviews the Fee Award Deferentially, and Appellants Fail to Show that the District Court Committed Any Error of Law. ..............................50

1. Appellants are not entitled to *de novo* review. ............50

2. No other circuit has adopted Appellants' proposed legal rule, which is based on a misreading of other circuits' precedent. .......................................53

B. The District Court Did Not Abuse Its Discretion in Weighing the *Johnson* Factors. ..........................................57

1. Hampe's fact-based challenges to the *Johnson* factors fall well short of showing clear error by the district court. ..............................................................59

2. The lodestar cross-check supports the fee award and does not show an abuse of discretion...................68

III. THE DISTRICT COURT PROPERLY REVOKED HAMPE'S COUNSEL'S *PRO HAC VICE* APPLICATIONS...........................73

CONCLUSION ........................................................................................74

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE, AND TYPE STYLE AND CERTIFICATION THAT PDF IS VIRUS FREE .......................................................75

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*1988 Trust for Children Dated 8/8/88 v. Banner Life Ins. Co.*,
    28 F.4th 513 (4th Cir. 2022) ............................................................... 37

*Aaron v. Target Corp.*,
    357 F.3d 768 (8th Cir. 2004) ............................................................... 52

*Actors' Equity Ass'n v. Am. Dinner Theatre Inst.*,
    802 F.2d 1038 (8th Cir. 1986) ....................................................... 1, 43

*Allapattah Servs., Inc., v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S. D. Fla. 2006) .............................................. 26

*Barnes v. Fleetboston Fin. Corp.*,
    No. 01-10395-NG, 2006 WL 6916834 (D. Mass. Aug. 22, 2006) ......... 17

*Beckman v. KeyBank, N.A.*,
    293 F.R.D. 467 (S.D.N.Y. 2013) .......................................................... 70

*Bezdek v. Vibram USA, Inc.*,
    809 F.3d 78 (1st Cir. 2015) ................................................................. 37

*Burbridge v. City of St. Louis, Missouri*,
    2 F.4th 774 (8th Cir. 2021) .......................................................... 1, 37

*Bush v. Marshalltown Med. & Surgical Ctr.*,
    123 F.3d 1130 (8th Cir. 1997) ............................................................. 60

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) ...................................................................... passim

*Chambers v. Whirlpool Corp.*,
    980 F.3d 645 (9th Cir. 2020) ..................................................... 1, 38, 41

*Conley v. Sears, Roebuck & Co.*,
    222 B.R. 181 (D. Mass. 1998) ............................................................. 69

*DeBoer v. Mellon Mortg. Co.*,
    64 F.3d 1171 (8th Cir. 1995) ............................................................... 37

*Devlin v. Scardelletti,*
   536 U.S. 1 (2002) ................................................................ 1, 29, 34, 36

*Droste v. Julien,*
   477 F.3d 1030 (8th Cir. 2007) ....................................................... 73

*Edelson P.C. v. Bandas Law Firm PC,*
   No. 1:16-cv-11057, 2019 WL 272812 (N.D. Ill. Jan. 17, 2019) ............ 12

*In Equifax Inc. Customer Data Securities Breach Litig.,*
   1:17-md-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar 17, 2020) ... 49, 61

*Ex parte Burr,*
   9 Wheat. 529 (1824) ...................................................................... 73

*Farber v. Crestwood Midstream Partners L.P.,*
   863 F.3d 410 (5th Cir. 2017) ......................................................... 35

*Farrell v. Bank of America Corp. N.A.,*
   827 Fed. Appx. 628 (9th Cir. 2020) ........................................... 66, 69

*First Bank of Marietta v. Hartford Underwriters Ins. Co.,*
   307 F.3d 501 (6th Cir. 2002) ......................................................... 41

*Fischel v. Equitable Life Assurance Soc'y,*
   307 F.3d 997 (9th Cir. 2002) ......................................................... 71

*Galloway v. Kan. City Landsmen, LLC,*
   833 F.3d 969 (8th Cir. 2016) ......................................................... 59

*Garber v. Office of Comm'r of Baseball,*
   No. 12-CV03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb. 27,
   2017) .......................................................................................... 12

*Goldberger v. Integrated Res. Inc.,*
   209 F.3d 43 (2d Cir. 2000) ....................................................... 55, 71

*Granillo v. FCA US LLC,*
   No. 16-153(FLW)(DEA), 2018 WL 4676057 (D.N.J. Sept. 28,
   2018) .......................................................................................... 40

*Health Republic Ins. Co. v. United States,*
  58 F.4th 1365 (Fed. Cir. 2023) ...................................... 55, 56

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ............................................................ 59

*Huyer v. Buckley,*
  849 F.3d 395 (8th Cir. 2017) ............................................ 57

*In re Anthem, Inc. Data Breach Litig.,*
  327 F.R.D. 299 (N.D. Cal. 2018) ...................................... 48

*In re Broiler Chicken Antitrust Litig.,*
  80 F.4th 797 (7th Cir. 2023) ........................... 50, 51, 52, 55

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
  No. MDL 1361, 2003 WL 22417252 (D. Me. Oct. 7, 2003) ................ 17

*In re Equifax Inc. Customer Data Sec. Breach Litig.,*
  999 F.3d 1247 (11th Cir. 2021) ................................... passim

*In re Fine Paper Antitrust Litig.,*
  751 F.2d 562 (3d Cir. 1984) .............................................. 71

*In re Gen. Electric Co. Sec. Litig,*
  998 F. Supp. 2d 145 (S.D.N.Y. 2014) ............................... 12

*In re Genetically Modified Rice Litig.,*
  764 F.3d 864 (8th Cir. 2014) ....................................... 53, 72

*In re Hydroxycut Mktg. and Sales Pracs. Litig.,*
  Nos. 09CV1088 BTM(KSC), 09CV2087 BTM(KSC), 2013 WL
  12110505 (S.D. Cal. Oct. 24, 2013) ................................... 41

*In re Initial Public Offering Securities Litig.,*
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ............................... 64

*In re Integra Realty Res., Inc.,*
  354 F.3d 1246 (10th Cir. 2004) ........................................ 35

vi

*In re Life Time Fitness, Inc., Telephone Consumer Protection Act (TCPA) Litig.*,
847 F.3d 619 (8th Cir. 2017) ...................................................... passim

*In re Mercedes-Benz Emissions Litig.*,
No. 2:16-cv-881(KM)(ESK), 2021 WL 7833193 (D.N.J. Aug. 2, 2021) ........................................................................................ 69

*In re Merry-Go-Round Enters. Inc.*,
244 B.R. 327 (Bankr. D. Md. 2000) .......................................... 69

*In re MetLife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010) ...................................... 17

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
768 Fed. Appx. 651 (9th Cir. 2019) ......................................... 60

*In re Optical Disk Drive Prods. Antitrust Litig.*,
959 F.3d 922 (9th Cir. 2020) ..................................................... 54

*In re Plastics Additives Antitrust Litig.*,
No. 08-3358, 2009 WL 405522 (3d Cir. Feb. 19, 2009) ....................... 35

*In re Rite Aid Corp. Sec. Litig.*,
396 F.3d 294 (3d Cir. 2005) ......................................... 53, 67, 68

*In re Snyder*,
472 U.S. 634 (1985) .................................................................... 73

*In re Syngenta AG MIR 162 Corn Litig.*,
61 F.4th 1126 (10th Cir. 2023) ................................................ 54

*In re Syngenta AG MIR 162 Corn Litig.*,
357 F. Supp. 3d 1094 (D. Kan. 2018) ...................................... 64

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001) ............................................. 54, 70

*In re Target Corp., Customer Data Sec. Breach Litig.*,
892 F.3d 968 (8th Cir. 2018) ....................................... 50, 58, 59

*In re Tremont Securities Law, State Law & Insurance Litig.*,
    699 Fed. Appx. 8 (2d Cir. 2017) ........................................... 71

*In re UnitedHealth Group Inc. S'holder Derivative Litig.*,
    631 F.3d 913 (8th Cir. 2011) .................................... 2, 34, 35

*In re Urethane Antitrust Litig.*,
    No. 04 Civ. 1616, 2016 WL 4060156 (D. Kan. July 29, 2016) ............ 64

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
    No. 15-7658(MAS)(LHG), 2020 WL 7585741 (D.N.J. Dec. 21,
    2020) ...................................................................... 44

*In re Vitamins Antitrust Litig.*,
    No. Misc. 99-197 (TFH), 2001 WL 34312839 (D.D.C. July 16,
    2001) ...................................................................... 64

*In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*,
    MDL No. 1735, No. 06-CV-00225, 2010 WL 786513 (D. Nev.
    Mar. 8, 2010) ............................................................. 17

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ........................................ 21, 31

*Keil v. Lopez*,
    862 F.3d 685 (8th Cir. 2017) ..................................... passim

*Link v. Wabash R. Co.*,
    370 U.S. 626 (1962) ...................................................... 41

*Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*,
    378 F.3d 774 (8th Cir. 2004) ........................................ 2, 35

*Marino v. Ortiz*,
    484 U.S. 301 (1988) ...................................................... 36

*Muchnick v. First Fed. Sav. & Loan Ass'n of Phila.*,
    No. 4:16-cv-03396-YGR, 1986 WL 10791 (E.D. Pa. Sept. 30,
    1986) ...................................................................... 69

*Nationwide Ins. Co. v. Cent. Missouri Elec. Co-op., Inc.*,
    278 F.3d 742 (8th Cir. 2001) .................................................... 36

*New England Carpenters Health Benefits Fund v. First
Databank, Inc.*,
    No. 4:16-cv-03396-YGR, 2009 WL 2408560 (D. Mass. 2009) ............. 69

*Nygaard v. Taylor*,
    78 F.4th 995 (8th Cir. 2023) ................................................... 53

*Palavra v. I.N.S.*,
    287 F.3d 690 (8th Cir. 2002) ................................................... 43

*Perez v. Rash Curtis & Assocs.*,
    No. 4:16-cv-03396-YGR, 2020 WL 1904533 (N.D. Cal. Apr. 17,
    2020) .............................................................................. 69

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ........................................ 42, 43, 50, 66

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ............................................................. 40

*Rawa v. Monsanto Co.*,
    934 F.3d 862 (8th Cir. 2019) ........................................... passim

*ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.*,
    59 F.4th 905 (8th Cir. 2023) ................................................... 51

*Sheets v. Butera*,
    389 F.3d 772 (8th Cir. 2004) ................................................... 39

*Staton v. Boeing*,
    327 F.3d 938 (9th Cir. 2003) ................................................... 66

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
    No. Civ. A. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19,
    2005) .............................................................................. 69

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993) ................................................... 68

*Timber Ridge Escapes, LLC v. Quality Structures of Ark., LCC*, 6 F.4th 781 (8th Cir. 2021)........................................52

*Tussey v. ABB, Inc.,*
746 F.3d 327 (8th Cir. 2014)............................................53

*United States v. City of Oakland,*
958 F.2d 300 (9th Cir. 1992)............................................36

*United States v. Gonzalez-Lopez,*
399 F.3d 924 (8th Cir. 2005)............................................73

*Uselton v. Commercial Lovelace Motor Freight, Inc.,*
9 F.3d 849 (10th Cir. 1993)..............................................58

*Waldoch v. Medtronic, Inc.,*
757 F.3d 822 (8th Cir. 2014)............................................36

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
396 F.3d 96 (2d Cir. 2005) .....................................passim

## Rules

Fed. R. App. P. 32...........................................................75

Fed. R. Civ. P. 12...........................................................30

Fed. R. Civ. P. 23...........................................................41

Fed. R. Civ. P. 37...........................................................41

## Other Authorities

Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. Empirical L. Stud. 811..passim

*Final Report and Recommendations of the Eighth Circuit Gender Fairness Task Force,*
31 *Creighton* L. Rev. 9 (1997) ...........................................65

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical L. Stud. 248, 265 (2010)...............................................65

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical L. Stud. 27 (2004)…… .............................................65

# STATEMENT OF ISSUES

1.     Objector Cassie Hampe is represented by her brother-in-law's law firm, which has a well-documented history of filing bad-faith objections through family members to hijack settlements. Hampe admitted that her objection was not the result of her independent concern about the fee request but was supplied to her by counsel. Did the district court act within its discretion when it struck Hampe's objection?

> *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)
>
> *Actors' Equity Ass'n v. Am. Dinner Theatre Inst.,* 802 F.2d 1038 (8th Cir. 1986)
>
> *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021)

2.     Connie Pentz refused to appear for a court-ordered deposition and never opposed Class counsel's motion to strike her objection. Did the district court act within its discretion when it struck her objection?

> *Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774 (8th Cir. 2021)
>
> *Chambers v. Whirlpool Corp.*, 980 F.3d 645 (9th Cir. 2020)

3.     Are Ms. Pentz and Hampe proper parties to appeal the attorneys' fee award if the district court properly struck their objections?

> *Devlin v. Scardelletti*, 536 U.S. 1 (2002)

*Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.,* 378 F.3d 774 (8th Cir. 2004)

*In re UnitedHealth Group Inc. S'holder Derivative Litig.,* 631 F.3d 913 (8th Cir. 2011)

4.  Applying this Circuit's decades-old legal standard, which requires consideration of all relevant facts, the district court awarded attorneys' fees equal to 22.5% of the cash fund created by the settlement, or less than 15.75% of the settlement's total value. In doing so, did the district court act within its "significant discretion" to set the fee award?

*Rawa v. Monsanto Co.*, 934 F.3d 862 (8th Cir. 2019)

*Keil v. Lopez*, 862 F.3d 685 (8th Cir. 2017)

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021)

5.  Did the district court properly exercise its discretion in revoking Hampe's counsels' *pro hac vice* admissions based on its finding of bad faith?

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)

## STATEMENT OF CASE

As one of the country's largest consumer brands, T-Mobile collects and maintains confidential personal identifiable information ("PII") of millions of potential, former, and current U.S. consumers, including names, Social Security numbers, driver's license numbers, phone numbers, unique technical identifiers tethered to current customers' mobile phones, and other uniquely identifying information. In 2021, T-Mobile's servers containing the PII for tens of millions of these customers was hacked (the "Data Breach").[1] The unidentified hackers offered to sell a subset of the stolen PII on the "dark web."[2] T-Mobile eventually disclosed that PII for about 76.6 million people was compromised.[3]

## I. CLASS COUNSEL OBTAINED AN EXCELLENT SETTLEMENT FOR THE CLASS.

In the months after T-Mobile announced the Data Breach, dozens of lawsuits were filed. The Judicial Panel on Multidistrict Litigation centralized the cases for pretrial purposes in the District Court for the

---

[1]     References to the Hampe Appendix and Addendum are cited as "H-App." and "H-Add." H-App. 178-181; R. Doc. 128, at 41-44. References to the Pentz Appendix and Addendum are cited as "P-App." and "P-Add." References to Plaintiffs-Appellees' Appendix are cited as PA-App.
[2]     H-App. 181-184; R. Doc. 128, at 44-47.
[3]     H-App. 185-86; R. Doc. 128, at 49.

Western District of Missouri.[4] The court appointed interim leadership and Class counsel.[5] Class counsel then embarked on an intensive vetting process to identify representative plaintiffs, which included examining detailed questionnaires, extensive interviews with victims, and responding to numerous victim inquiries.[6] Ultimately, they prepared and filed a 338-page complaint on behalf of 64 named Plaintiffs from 39 states, alleging common-law claims on behalf of a nationwide and multiple state subclasses against T-Mobile, as well as 86 distinct state statutory claims.[7]

The named Plaintiffs suffered real harms due to the Data Breach, including actual and attempted identity theft and fraud, such as unauthorized credit applications filed in their names, accounts opened in their names, charges and bank transfers, access to financial and other accounts, attempts to change the account passwords, as well as attempted identity theft such as increased phishing attempts in the form of emails, texts, and phone calls, as well as ongoing and imminent

---

[4]     H-App. 102; R. Doc. 1, at 1.
[5]     H-App. 115; R. Doc. 102, at 1.
[6]     H-App. 728; R. Doc. 179-1, at 5.
[7]     H-App. 728-29; R. Doc. 179-1, at 5-6.

increased risk of harm.[8] Third-party monitoring companies confirmed widespread injurious activity, notifying numerous Plaintiffs and other Class members that their PII was found on the dark web as a direct result of the Data Breach.[9]

Written discovery commenced immediately after filing of the consolidated complaint.[10] Class counsel served document requests and interrogatories on T-Mobile.[11] And they sent preservation letters to several third parties involved in the investigation of the Data Breach.[12] The parties litigated the governing electronic discovery and protective orders, exchanged initial disclosures, responded to a motion to remand, and prepared for protracted litigation.[13]

As the litigation ramped up, counsel for the parties also began to explore the possibility of an early settlement. They exchanged confidential discovery documents and information related to the Data Breach and the named Plaintiffs to meaningfully engage in potential

---

[8]     H-App. 142-175, 198-204; R. Doc. 128, at 5-38, 61-67.
[9]     H-App. 142-175; R. Doc. 128, at 5-38.
[10]    H-App. 729; R. Doc. 179-1, at 6.
[11]    H-App. 729; R. Doc. 179-1, at 6.
[12]    H-App. 729; R. Doc. 179-1, at 6.
[13]    H-App. 728-29; R. Doc. 179-1, at 5-6.

arm's-length negotiations.[14] After multiple initial discussions among counsel, the Honorable Diane M. Welsh (Ret.) was hired to facilitate a formal mediation.[15] Following pre-mediation negotiations and a two-day, in-person mediation, the parties executed a term sheet.[16] Over the course of several following weeks, they negotiated and signed a formal Settlement Agreement.[17]

To compensate Class members for losses already suffered and to proactively protect them from future harm due to the Data Breach, the Settlement created a $350 million cash fund,[18] an unprecedented amount in per-capita terms for large data breaches.[19]

On top of the $350 million, the Settlement also requires T-Mobile to make additional investments in data security to protect Class members' PII from future attacks.[20] The Settlement mandates the company to increase its data-security budget by at least $150 million over

---

[14]    H-App. 729-30; R. Doc. 179-1, at 6-7.
[15]    H-App. 730; R. Doc. 179-1, at 7.
[16]    H-App. 730; R. Doc. 179-1, at 7.
[17]    H-App. 730; R. Doc. 179-1, at 7.
[18]    H-Add. 42; H-App. 1318; R. Doc. 235, at 30.
[19]    H-Add. 42; H-App. 1318; R. Doc. 235, at 30.
[20]    H-Add. 31; H-App. 1307; R. Doc. 235, at 19.

the following two years.[21] Collectively, under the Settlement, T-Mobile must spend at least $500 million for the benefit of the Class.

The Settlement provides three ways for Class members to obtain direct cash payments. First, they can be reimbursed for all out-of-pocket losses up to $25,000—broadly defined to include virtually any loss fairly traceable to the Data Breach.[22] Second, they can be compensated for up to 15 hours of lost time spent remedying issues related to the Data Breach.[23] Third, as an alternative to submitting the proof requirements for the first two forms of relief, Class members can request and receive $25 cash payments ($100 for California subclass members) with no proof required.[24]

The Settlement also makes available two years of paid-for Identity Defense Services, a comprehensive credit-monitoring service provided by an unaffiliated third party.[25] Those services include but are not limited to high-risk transaction monitoring, dark-web monitoring, $1,000,000 in

---

[21]    H-Add. 31; H-App. 1307; R. Doc. 235, at 19.
[22]    H-App. 655; R. Doc. 158-5, at 8.
[23]    H-App. 655-56; R. Doc. 158-5, at 8-9.
[24]    H-App. 656; R. Doc. 158-5, at 9.
[25]    H-App. 656; R. Doc. 158-5, at 9.

identity theft insurance, and victim assistance.[26] The retail cost of that service is $96 per person, per year.[27] Moreover, even Class members who file no claim are entitled to third-party restoration services if they later suffer identity theft or fraud, which includes access to a U.S.-based call center to assist in remediating any harm.[28]

In preliminarily approving the Settlement, the district court approved a notice of Settlement to the Class, which was disseminated widely.[29] The Class reacted by submitting more than 1.5 million claims by January 10, 2023.[30] Only 0.02% of 76 million Class members asked to be excluded from the Settlement, while only 13 Class members filed timely objections.[31] Only nine Class members, including the Appellants here, objected to Class counsel's requested fee.[32]

---

[26]     H-App. 656-57; R. Doc. 158-5, at 9-10.
[27]     H-App. 678; R. Doc. 158-7, at 3.
[28]     H-App. 679; R. Doc. 158-7, at 4.
[29]     PA-App. 63; R. Doc. 211-1, at 8.
[30]     PA-App. 63; R. Doc. 211-1, at 10.
[31]     PA-App. 85; R. Doc. 211-2, at 8.
[32]     H-Add. 50; H-App. 1326; R. Doc. 235, at 38.

## II.   CASSIE HAMPE AND CONNIE PENTZ'S OBJECTIONS TO CLASS COUNSEL'S FEE REQUEST WERE STRICKEN.

The Settlement Agreement and Class notice advised that Class counsel may seek "up to 30% of the Settlement Fund."[33] However, on November 17, 2022, Class counsel moved for an award of attorneys' fees equal to only 22.5% of the $350 million cash portion of the common fund (or 15.75% of the $500 million total value of the Settlement, including the additional $150 million in security spending).[34] The motion and supporting suggestions were posted to the Class website.[35]

At the time of their motion, Class counsel had expended more than 8,225 hours from the inception of the cases.[36] Based on actual experience in prior large data-breach settlements, Class counsel conservatively projected spending another 3,000 hours to litigate appeals, administer the Settlement, manage the claims process, and respond to Class members' inquiries.[37] By January 6, 2023 (the most recent update in the record), Class counsel had already expended 890.3 of those projected

---

[33]   H-App. 659; R. Doc. 158-5, at 12.
[34]   H-App. 731; R. Doc. 179-1, at 8.
[35]   H-App. 740; R. Doc. 179-1, at 17.
[36]   H-App. 739; R. Doc. 179-1, at 16.
[37]   H-App 739-40; R. Doc. 179-1, at 16-17.

hours (even though the processing and potential appeals of claims were placed on hold pending this appeal), bringing their total to 9,117 hours.[38] The fee request was also supported by the declaration of Brian T. Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt University, whose academic research includes empirical studies of class-action fee awards.[39]

Hampe and Pentz objected to the fee request.[40]

## A. The District Court Struck Hampe's Objection Because It Was Made In Bad-Faith.

Hampe's objection urged the district court to reject Class counsel's fee request and, citing a *single* statistic from a *single* study, insisted that the district court must award fees equal to 10.2% of $350 million.[41] Hampe also moved to exclude the Fitzpatrick declaration[42] and argued that the additional $150 million data security commitment should be

---

[38]    PA-App. 64; R. Doc. 211-1, at 9.
[39]    H-App. 758; R. Doc. 179-2, at 2.
[40]    H-App. 779-806; R. Doc. 189, at 1-28. *See also* P-Add. 57-61; P-App. 93-98; R. Doc. 197, at 1-5.
[41]    H-App. 795-96; R. Doc. 189, at 17-18.
[42]    H-App. 801-803; R. Doc. 189, at 23-25.

excluded from the Settlement's total value as it would also benefit people who "will become T-Mobile customers after the class period."[43]

In addition to local counsel, Hampe was represented by Robert Clore ("Clore") and Mikell West ("West") of the Bandas Law Firm, LLC ("Bandas Firm").[44] Clore and West each applied for and received (as a matter of course) admission *pro hac vice*.[45]

The Bandas Firm is owned and managed by Christopher Bandas ("Bandas"), who has a well-documented history of filing frivolous class-action objections using family members who happen to be members of the settlement class, including Appellant Hampe and her spouse, Clark Hampe. When challenged, courts have often found these and other objections that Bandas and his firm have filed to have been "brought in bad faith" and to have formed part of a "history of vexatious conduct through frivolous settlement objections," characterizing Bandas as a "known vexatious appellant" who was "repeatedly admonished for

---

[43]    H-App. 794; R. Doc 189, at 16 n.10.

[44]    H-App. 787-88; R. Doc. 189, at 9-10.

[45]    H-App. 814; R. Doc. 190, at 1. *See also* H-App. 823-24; R. Doc. 191, at 1-2.

pursuing frivolous appeals of objections to class-action settlements."[46] Bandas has been called a "professional" objector who "primarily seek[s] to obstruct or delay settlement proceedings so as to extract attorneys' fees in exchange for the withdrawal of the objection."[47]

Bandas and the Bandas Firm have also admitted, in a federal district court, to having engaged in "unethical, improper, and misleading conduct in filing or causing to be filed objections to proposed class action settlements" and admitted that this conduct "placed self-interest and financial considerations above ethical obligations."[48] That court issued a permanent injunction prohibiting Bandas and the Bandas Firm from, *inter alia*, "[s]eeking admission, pro hac vice or otherwise, to practice in any state or federal court without fully and truthfully responding to all questions on the application and without attaching a copy" of the injunction.[49]

---

[46]    H-App. 830-31; R. Doc. 208, at 6-7 (quoting *In re Gen. Electric Co. Sec. Litig*, 998 F. Supp. 2d 145, 156 (S.D.N.Y. 2014)).

[47]    H-App. 832-33; R. Doc. 208, at 8-9 (quoting *Garber v. Office of Comm'r of Baseball*, No. 12-CV03704 (VEC), 2017 WL 752183, at *4 n.9 (S.D.N.Y. Feb. 27, 2017).

[48]    H-App. 872-73; R. Doc. 208-2, at 3-4.

[49]    *See Edelson P.C. v. Bandas Law Firm PC*, No. 1:16-cv-11057, 2019 WL 272812, at *1 (N.D. Ill. Jan. 17, 2019) (the "Bandas Injunction").

In light of Bandas and his firm's history, Class counsel sought and the district court permitted a deposition of Hampe.[50] Following the deposition, Class counsel moved to strike Hampe's objection and to revoke Clore's and West's *pro hac vice* admissions.[51] After briefing from both sides, on January 20, 2023, the district court heard arguments from counsel.[52] At the hearing, the Court invited proposed orders from both sides.[53] Several months later, the district court granted the motion.[54]

Citing both its rule-based and "discretionary power," the district court struck Hampe's objection.[55] It found this objection was part of the Bandas Firm's "patterns of objection practice" because the Bandas Firm and Hampe were "'serial' objectors" who had brought this objection "vexatious[ly] and . . . in bad faith . . . for the sole purpose of extracting a fee from the settlement fund."[56] In supporting its findings, the district court recited a detailed history of the Bandas Firm's past conduct, referring to the 84 known objections filed by the Bandas Firm, its use of

---

[50]   H-App. 130; R. Doc. 203 (Minute Entry).
[51]   H-App. 825; R. Doc 208, at 1.
[52]   H-App. 986-1016; R. Doc. 224, at 9-39.
[53]   H-App. 1057, 1063; R. Doc. 224, at 80, 86.
[54]   H-Add. 1-12; H-App. 1277-88; R. Doc. 234, at 1-12.
[55]   H-Add. 9-10; H-App. 1285-86; R. Doc. 234, at 9-10.
[56]   H-Add. 9; H-App. 1285; R. Doc. 234, at 9.

family members to file objections and extract compensation, and the findings of various other courts.[57]

The district court rejected Hampe's attempt to minimize the Bandas Firm's infamous past based on the formal absence of Bandas himself from the case. At her deposition, Hampe testified she was represented by the Bandas Firm, her retainer agreement was with the Bandas Firm, and that this was the second objection in a data-breach lawsuit it had filed on her behalf.[58] She also admitted that Bandas, the "principal" of the Bandas firm, was her brother-in-law.[59] She expressed ignorance about her husband's past participation as an objector for the Bandas Firm, including the case in which he was found to have been a vexatious objector.[60] And she testified that her purported initial concerns, upon reading the Class notice, related to the adequacy of the cash relief, not the attorneys' fees, which concern originated with counsel at the Bandas Firm.[61]

---

[57] H-Add. 2-6; H-App. 1278-82; R. Doc. 234, at 2-6.
[58] H-App. 848-50, 854; R. Doc. 208-1, at 5-7, 11.
[59] H-App. 849-50; R. Doc. 208-1, at 6-7.
[60] H-App. 851; R. Doc. 208-1, at 8.
[61] H-App. 863-65; R. Doc. 208-1, at 20-22.

Based on her testimony and her retainer agreement, the district court found that the "Bandas Firm's demonstrated history of improper objection practices can and should be imputed to Mr. Clore and Mr. West, and the Bandas Firm's client Ms. Hampe."[62] Moreover, the court noted that, despite her supposed concern about the cash relief, Hampe did not object to the Settlement itself, and her challenge to attorneys' fees was "apparently suggest[ed]" by Clore and the Bandas Firm.[63] The court found her objection "vexatious and brought in bad faith . . . for the sole purpose of extracting a fee from the settlement fund."[64]

The court also revoked Clore's and West's *pro hac vice* admissions based on its findings, noting that Clore was denied similar admissions by two other courts and that West (previously an objector represented by the Bandas Firm but now serving as counsel in the firm) was personally found "not to be acting in the best interests of [a] settlement class."[65] In addition, the court found that both attorneys had made misleading certifications in their *pro hac vice* applications.[66]

---

[62]    H-Add. 6; H-App. 1282; R. Doc. 234, at 6.
[63]    H-Add. 6-7 n.4; H-App. 1282-83 n.4; R. Doc. 234, at 7 n.4.
[64]    H-Add. 9; H-App. 1285; R. Doc. 234, at 9.
[65]    H-Add. 11; H-App. 1287; R. Doc. 234, at 11.
[66]    H-Add. 11-12; H-App. 1287-1288; R. Doc. 234, at 11-12.

## B. The District Court Struck Connie Pentz's Objection As A Discovery Sanction.

The clerk received an objection from Connie Pentz by mail.[67] The court had instructed in its Class notice that any objector "represented by counsel" identify their counsel by name in their objection.[68] The court explained in its preliminary approval order that any Class member "who fails to object . . . in the manner described" will be "deemed to have waived any such objection."[69] A similar warning was prominently included in the Class notice.[70] Ms. Pentz identified no attorney and instead purported to be acting *pro se*.[71]

Her objection raised several red flags regarding its compliance with the court's order. First, despite purporting to be pro se, her objection read like a legal brief and contained numerous citations to legal authority, challenging the fee award on the grounds that it should be limited to "10% in this megafund settlement" and referencing twelve multi-billion

---

[67]   P-Add. 57-61; P-App. 94-98; R. Doc. 197, at 1-5.
[68]   H-App. 660-61; R. Doc. 158-5, at 13-14. *See also* PA-App. 8; R. Doc. 162, at 8.
[69]   PA-App. 9; R. Doc. 162, at 9.
[70]   H-App. 661; R. Doc. 158-5, at 14.
[71]   P-Add. 57-61; P-App. 94-98; R. Doc. 197, at 1-5.

class-action settlements.[72] Second, while her objection said she lived in Pennsylvania, it was mailed from Boston, Massachusetts.[73] Third, notorious serial objector's counsel John Pentz, who is her son,[74] had an office in Boston, and has been as problematic as the Bandas Firm in bringing bad-faith objections to class-action settlements,[75] including having a history of using family members to front his bad-faith objections.[76]

---

[72]   P-Add. 57-60; P-App. 94-97; R. Doc. 197, at 1-4.

[73]   P-Add. 61; P-App. 98; R. Doc. 197, at 5.

[74]   PA-App. 34; R. Doc. 209-3, at 3 (¶6).

[75]   PA-App. 14-15; R. Doc. 209, at 2-3 (citing *In re Initial Pub. Offering Sec. Litig. ("In re IPO Sec. Litig.")*, 721 F. Supp. 2d 210, 214–15 (S.D.N.Y. 2010) (calling Pentz a "serial" objector, finding "evidence of bad faith or vexatious conduct" by Pentz and other attorneys for objectors, and requiring Pentz to post an appeal bond); *In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, MDL No. 1735, No. 06-CV-00225, 2010 WL 786513, at *1–2 (D. Nev. Mar. 8, 2010) (noting, in requiring that Pentz post an appeal bond, that Pentz has "a documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when [he and his clients] were compensated by the settling class or counsel for the settling class"); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 350 (E.D.N.Y. 2010) (characterizing Pentz's objections as "meritless"); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *2 n.3 (D. Me. Oct. 7, 2003) (requiring an appeal bond, calling Pentz a "repeat objector," and characterizing his objection as "groundless" and potentially frivolous)).

[76]   PA-App. 14; R. Doc. 209, at 2 (citing *Barnes v. Fleetboston Fin. Corp.*, No. 01-10395-NG, 2006 WL 6916834, at *2 & n.1 (D. Mass. Aug. 22, 2006) (calling Pentz a "professional objector" and noting he was

Class counsel contacted Ms. Pentz to secure her deposition, at which point she told them she was "not represented by counsel."[77] After she refused to return subsequent calls, Class counsel obtained the court's permission to take her deposition.[78] Extensive efforts were made to serve a subpoena on Ms. Pentz, but she "repeatedly refused to answer the door or accept service."[79] Eventually a notice of the deposition scheduled for January 3, 2023 was left at the door of her residence. She subsequently communicated by telephone that she now had a lawyer (whose identity she repeatedly refused to disclose), that she had received the notice, but that she would not sit for the deposition.[80] She neither appeared[81] nor sought relief from the court, through either a protective order or an order quashing the deposition, and her purported attorney (now confirmed to be her son) never appeared.

---

representing his mother-in-law in that case and had represented his wife in a prior case)).

[77]     PA-App. 23; R. Doc. 209-1, at 2 (¶2).

[78]     PA-App. 23-24; R. Doc. 209-1, at 2-3 (¶¶2-5).

[79]     PA-App. 24; R. Doc. 209-1, at 3 (¶6). *See also* PA-App. 28-31; R. Doc. 209-2, at 2-5.

[80]     PA-App. 24; R. Doc. 209-1, at 3 (¶¶7-9).

[81]     PA-App. 26; R. Doc. 209-1, at 5 (¶15).

Class counsel moved to strike Connie Pentz's objection, arguing her evasion of reasonable and court-ordered discovery prejudiced Class counsel's ability to fully respond to the objection.[82] In particular, one reason counsel sought to depose Ms. Pentz was to see if her objection had been ghost-written by John Pentz—an issue for which other objectors (including Bandas) had been criticized and sanctioned in the past.[83]

The motion was served on Ms. Pentz, who did not respond or appear at the hearing to argue or oppose the motion through counsel or otherwise.[84] The district court granted the motion, finding that Ms. Pentz failed to justify not appearing for her deposition, as ordered by the court, a failure that also gave "credence to Class [c]ounsel's suspicion that John Pentz may have written and submitted Ms. Pentz's objection on her behalf."[85]

Ms. Pentz passed away after the approval of the settlement. The notice of appeal was purportedly filed on behalf of Ms. Pentz's estate by

---

[82]    PA-App. 13; R. Doc. 209, at 1.

[83]    PA-App. 18-19; R. Doc. 209, at 6-7 (citing findings from three different courts against Bandas relating to frivolous class-action objections).

[84]    H-App. 985; R. Doc. 224, at 8. *See also* P-Add. 56; P-App. 93; R. Doc. 233, at 4.

[85]    P-Add. 56; P-App. 93; R. Doc. 233, at 4.

claimed executor John Pentz,[86] who entered an appearance in this appeal and filed and signed the opening brief. John Pentz has filed no papers with the district court or in this appeal demonstrating his ability to act on behalf of his mother's estate.

## III. APPLYING THIS COURT'S WELL-ESTABLISHED PRECEDENT GOVERNING FEE AWARDS, THE DISTRICT COURT APPROVED THE SETTLEMENT AND AWARDED ATTORNEYS' FEES.

On June 29, 2023, the district court issued an order granting final approval of the Settlement and granting Class counsel's motion for attorneys' fees and expenses.[87] Although stricken, the district court nonetheless considered and addressed the substance of Appellants' objections to the fee request.[88] The court rejected their arguments, and those of other objectors, that it should award a smaller fee.[89]

Acknowledging its discretion to award attorneys' fees via either the lodestar method or the "percentage of the benefit method," the district court "exercise[d] its discretion to apply the percentage method," which "permits an award of fees that is equal to some fraction of the common

---

86    PA-App. 331; R. Doc. 240, at 1.
87    H-Add. 13; H-App. 1289; R. Doc. 235, at 1.
88    H-Add. 51; H-App. 1327; R. Doc. 235, at 39 n.9.
89    H-Add. 51; H-App. 1327; R. Doc. 235, at 39.

fund that the attorneys were successful in gathering through the course of the litigation."[90] Citing this Court's instruction in *Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019), the district court held that it would "evaluate[]" the "ultimate reasonableness of the award" by "considering the relevant factors from the twelve factors listed in *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 719-20 (5th Cir. 1974)."[91]

Based on all the factors, the court concluded that 22.5% of the $350 million cash fund, or 15.75% of T-Mobile's $500 million cash commitment to the settlement was reasonable, especially "[c]onsidering the extraordinary relief Class [c]ounsel expediently obtained in the face of potentially drawn-out litigation with severe risks and an uncertain outcome."[92] The "most critical factor" was the benefits obtained, which the court found to be a "significant recovery for the class."[93] In fact, the court agreed that the $350 million fund is not only one of "the largest data breach settlements in history" but significantly better, on a per-

---

[90]     H-Add. 40-41; H-App. 1316-17; R. Doc. 235, at 28-29 (internal marks omitted).
[91]     H-Add. 40; H-App. 1316; R. Doc. 235, at 28.
[92]     H-Add. 50; H-App. 1326; R. Doc. 235, at 38.
[93]     H-Add. 42; H-App. 1318; R. Doc. 235, at 30 (internal marks omitted).

capita basis, than other large data-breach settlements.[94] Class counsel obtained such extraordinary relief despite "substantial risks," including that "T-Mobile was prepared to seek enforcement of arbitration clauses against a sizeable portion of the Class," and despite that "data breach litigation" remains "risky" with "difficult and . . . cutting edge issues" creating the risk of nonrecovery of contingent work, which is "a major factor in awarding attorney fees."[95]

The district court also expressly considered hours worked, crediting Class counsel with performing "9,100 hours prosecuting the litigation" and finding that Class counsel had made a "significant investment of time [which] weigh[ed] in favor of the requested fee"; in particular, it credited "the substantial amount of time Class [c]ounsel expended" as resulting in an "efficient[] resolution" of the litigation that otherwise would have "unnecessarily occupied judicial resources for months, if not years."[96] On this point, the court found that "[e]fficient resolution in data breach litigation is particularly important," since "the injunctive and

---

94    H-Add. 42; H-App. 1318; R. Doc. 235, at 30.
95    H-Add. 43-44; H-App. 1319-20; R. Doc. 235, at 31-32 (internal marks omitted).
96    H-Add. 45-46; H-App. 1321-22; R. Doc. 235, at 33-34 (internal marks omitted).

identity protection components of the Settlement can have the most impact when delivered as near as possible to the breach."[97] So, delivering "expeditious relief" in these circumstances, "particularly extraordinary relief like the Settlement here," was "independently valuable" to the Class and "weighs in favor of the requested fee."[98]

The district court also agreed that Class counsel's work was far from finished, finding they would make a "significant commitment of time in the future" of "at least another 3,000 hours."[99]

As to the skill and reputation of Class counsel, it found them to be "highly skilled and reputable [with] experience[] in litigating data breach cases."[100]

The court also noted that the "extremely small number of objectors," which as a percentage of the Class was close to zero, weighed in favor of the requested fee.[101]

In comparing 22.5 percent to awards in similar cases, the district

---

[97]   H-Add. 45-46; H-App. 1321-22; R. Doc. 235, at 33-34.
[98]   H-Add. 45; H-App. 1321; R. Doc. 235, at 33.
[99]   H-Add. 46; H-App. 1322; R. Doc. 235, at 34.
[100]   H-Add. 46; H-App. 1322; R. Doc. 235, at 34.
[101]   H-Add. 47; H-App. 1323; R. Doc. 235, at 35 (internal marks omitted).

court found three metrics relevant: class-action awards in the Eighth Circuit; class-action awards in other large, data-breach settlements; and scholarly analysis.[102] First, as to other awards in this Circuit, it found that "even if the fee [here] is based only on the cash fund, ignoring all other monetary and non-monetary benefits, the requested percentage (22.5%) is substantially less than the percentages commonly awarded in the Eighth Circuit."[103] Second, the percentage of the cash fund is also "below the 23.5% average fee awarded in the five largest data breach class action settlements to date."[104] Third, the first two conclusions "align with the findings of prominent surveys of percentage fee awards," including the study by Brian T. Fitzpatrick ("Fitzpatrick study") finding that the mean and median fee percentages for settlements between $250 million and $500 million are 17.8% and 19.5% respectively."[105]

Although the court acknowledged that 22.5% was above the median in the Fitzpatrick study, in considering the "additional $150 million T-Mobile is required to spend on data security over the next two years," the

---

[102]    H-Add. 47; H-App. 1323; R. Doc. 235, at 35.
[103]    H-Add. 48; H-App. 1324; R. Doc. 235, at 36.
[104]    H-Add. 48; H-App. 1324; R. Doc. 235, at 36.
[105]    H-Add. 48; H-App. 1324; R. Doc. 235, at 36.

actual percentage is between 15.75% and 22.5%, which compares "favorably to the similar cases."[106]

Finally, even though "not required" as part of the *Johnson* factors under *Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017), the district court conducted a "lodestar crosscheck," considering Class counsel's lodestar (hours expended multiplied by a reasonable hourly rate) and the resulting 9.6 multiplier (percentage-based fee divided by lodestar) based on the percentage award.[107] It concluded, however, that the lodestar "has limited value" given "the facts of this case" as it would overemphasize hours by "penaliz[ing] counsel for obtaining remarkable relief quickly, and lead to setting fees in a formulaic way in contravention of the flexible, multifactor *Johnson* analysis."[108] Nonetheless, citing other cases, the district court concluded that the multiplier was "reasonable under all the circumstances and considering the *Johnson* factors."[109]

Three objectors, including Hampe and Ms. Pentz, urged the court to adopt a lower fee based on "economies of scales for megafund

---

[106]    H-Add. 48-49; H-App. 1324-25; R. Doc. 235, at 36-37.

[107]    H-Add. 49-50; H-App. 1325-26; R. Doc. 235, at 37-38.

[108]    H-Add. 49; H-App. 1325; R. Doc. 235, at 37 (internal markings omitted).

[109]    H-Add. 50; H-App. 1326; R. Doc. 235, at 38.

settlements" using a "sliding scale" or "lower fees as the size of the fund increases."[110] But the district court declined to award a fee lower than requested, citing the "multifactor approach" encompassed in *Johnson*, and embraced by this Court.[111] The "whole purpose of [the percentage approach] is to align the interests of Class [c]ounsel and the Class by rewarding counsel in proportion to the result obtained."[112] The court cited heavily the decision by the Eleventh Circuit in *Equifax* that "recently rejected a nearly identical fee objection" brought by Clore and West.[113]

Next, the district court overruled Hampe's and Ms. Pentz's objections that the fee requested was "too high" based on "one 2010 study of [mean and median] attorneys' fees in class-action settlements."[114] That study, the "2010 Eisenberg & Miller study," showed fee awards "above $175 million are 12% and 10.2%" in mean and median percentage awarded, respectively.[115] But other studies showed "much higher mean

---

[110]    H-Add. 51; H-App. 1327; R. Doc. 235, at 39.
[111]    H-Add. 51-53; H-App. 1327-29; R. Doc. 235, at 39-41.
[112]    H-Add. 52-53; H-App. 1328-29; R. Doc. 235, at 40-41 (quoting *Allapattah Servs., Inc., v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S. D. Fla. 2006).
[113]    H-Add. 51-52; H-App. 1327-28; R. Doc. 235, at 39-40.
[114]    H-Add. 53; H-App. 1329; R. Doc. 235, at 41.
[115]    H-Add. 53; H-App. 1329; R. Doc. 235, at 41.

and median fee award percentages,"[116] including one study of settlements greater than $100 million showing fee percentages ranging from 16.6% (in 2009) to 25.5% (in 2011).[117] In addition, the district court noted that the Fitzpatrick study of settlements between $250 and $500 million (the range in which the cash portion of this Settlement falls) showed a mean percentage of 17.8% and a median percentage of 19.5%.[118] In sum, the evidence "demonstrate[d] the high degree of variability and imprecision that would be involved in attempting to adopt Hampe's proposed approach" of awarding fees based on the median of a single study, particularly when that approach also suffered from the "fundamental flaw" that no "Eighth Circuit authority [has] adopt[ed] or applie[d]" it.[119]

The district court found Appellants' objections had another problem: They failed to consider the value of T-Mobile's $150 million data security commitment to the Class, the kind of commitment, the district court observed, that courts "routinely consider[]" in setting fees, "especially in the data breach context."[120] Moreover, "Hampe did not

---

[116]    H-Add. 54; H-App. 1330; R. Doc. 235, at 42.
[117]    H-Add. 54; H-App. 1330; R. Doc. 235, at 42.
[118]    H-Add. 54; H-App. 1330; R. Doc. 235, at 42.
[119]    H-Add. 54-55; H-App. 1330-31; R. Doc. 235, at 42-43.
[120]    H-Add. 54; H-App. 1330; R. Doc. 235, at 42 (citation omitted).

contest this point in her response" and so "it is appropriate to apply the percentage to the entire $500 million class benefit."[121]

Ultimately, the "effort to peg all large settlements to an average in a single 2010 study [was] effectively an invitation to impose a mega fund cap," which the court declined to do.[122] The district court, thus, found that the entirety of the *Johnson* factors supported the requested fee.

## SUMMARY OF THE ARGUMENT

Of the more than 76 million Class members, only two appealed. These two objectors, Cassie Hampe and the estate of Connie Pentz, are each closely related to two of the most well-documented, notorious bad-faith class-action objectors' counsel in the country. Multiple courts have found that their actions have exploited the objection process for personal gain, pointedly criticized, enjoined, and sanctioned them. Several independent reasons exist for this Court to affirm or dismiss their appeals of the fee award.

---

[121]    H-Add. 54; H-App. 1330; R. Doc. 235, at 42.
[122]    H-Add. 56; H-App. 1332; R. Doc. 235, at 44.

## I.

Appellants gloss over the threshold issue, which is whether they even have the right to appeal. Only a "party" may appeal from an adverse judgment, and absent class members are considered parties only when they timely and validly object. *Devlin v. Scardelletti*, 536 U.S. 1, 10-11 (2002). The district court struck Appellants' objections, so to be proper parties to appeal, both Appellants must first show that doing so was an error. Both fail to meet that burden.

## A.

The district court properly struck Ms. Pentz's objection as a discovery sanction because she failed to appear for her deposition. Ms. Pentz did not seek to quash the properly noticed deposition nor oppose the motion to strike below. She thus failed to preserve for appellate review her claim that the district court erred. Although this is reason enough to disregard her arguments, she now offers for the first time that the deposition should never have been ordered. Even if this new argument is considered under plain error review, she still fails to show an abuse of discretion.

The attorney for her estate—serial class-action objector John Pentz, her son, and her purported estate administrator—now admits he counseled her in the district court without disclosing his representation as required by the district court's order and despite her objection being submitted as "pro se." Notably, this exact concern was to be a subject of the deposition for which Connie Pentz never appeared. Thus, John Pentz's new disclosures further confirm the propriety of deeming the objection invalid given her violation of the district court's preliminary approval order, and his "ghostwriting" of her purportedly *pro se* objection raises serious ethical concerns.

## B.

The district court struck Hampe's objection because it was "vexatious and brought in bad faith" by Hampe and her counsel, the Bandas Firm, who are well-documented serial objectors' counsel with a pattern of using the objection process to extort compensation. The district court did not abuse its discretion, as the record was replete with evidence of the Bandas Firm's patterns of misconduct, which Hampe fails to challenge on appeal. Further, Hampe's deposition testimony confirmed her objection was prompted by her brother-in-law's firm. Nonetheless,

Hampe argues it was legal error to strike her objection pursuant to Federal Rule of Civil Procedure 12(f) because an objection is not a "pleading." That argument is specious but, in any event, the Court's inherent authority and its authority under Rule 23 were sufficient to permit it to strike the objection here.

## II.

Since the objections were properly stricken, no "party" at interest has appealed the fee award. Nonetheless, even if the Appellants' arguments are considered, they similarly fail to justify reversal.

## A.

Appellants first argue for *de novo* review by claiming the district court committed "methodological" error. But the district court has broad discretion to award fees as a percentage of a common fund (as it did here) and to assess the reasonableness of those fees according to the multiple factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *See Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019). Appellants do not and could not argue that the district court failed to apply this methodology. Instead, they take issue with the percentage approved by the district court based on the size of the

Settlement fund (that it is a so-called "mega-fund") and a single statistic from one of several academic studies of class-action fees considered by the district court. Those grievances plainly go to weight, not methodology, and must be reviewed (if at all) with deference to the district court's "significant discretion" in awarding attorneys' fees from a common fund. *In re Life Time Fitness, Inc., Telephone Consumer Protection Act (TCPA) Litig.*, 847 F.3d 619, 623 (8th Cir. 2017). That conclusion is supported by the law in every cited circuit.

## B.

Under that standard, Appellants also fail to show the court abused its discretion in its analysis of the *Johnson* factors, including the extent to which so-called "economies of scale" required the district court to adopt a smaller percentage. Most importantly, the district court gave greatest weight to the sizeable and unprecedented relief Class counsel obtained, which it found was an extraordinary Settlement achieved expediently for the benefit of the Class. That finding was far from clear error: Class counsel secured a Settlement that, by any proper measure, is significantly greater on a per-person basis than results obtained in other large data-breach settlements. And they did so relatively quickly,

delivering the benefits when they can most successfully remediate the harm to the victims—and prevent further harm. Moreover, it is undisputed that Class counsel requested and the district court awarded a percentage of the fund that was *lower* than the Settlement Agreement permitted and *lower* than the average in other settlements, including below the average percentage awarded in other $100-million-plus data-breach settlements. Finally, notwithstanding Appellants' preferred academic study, the fee percentage was also supported by another academic study of settlements of similar size. And it was within the district court's discretion to weigh allegedly conflicting data.

In the end, the percentage amount the district court selected accounted for all the factors that Appellants now claim required it to award less. Appellants do no more than invite this Court to substitute its judgment for the district court's discretion. Appellants do not (and cannot) show that the fee awarded falls outside the range of reasonable outcomes and is an abuse of discretion.

## III.

Lastly, Hampe fails to show the district court abused its discretion in revoking her attorneys' admission to practice in this underlying

litigation as an unlicensed non-resident. Such an admission is a privilege, not a right. Hampe makes no showing that, in revoking that privilege, the district court abused its discretion given the pattern and history of the Bandas Firm in pursuing vexatious and bad-faith objections.

## ARGUMENT

## I. APPELLANTS ARE NOT PROPER PARTIES TO APPEAL THE FEE AWARD.

The district court properly exercised its discretion to strike both objections. Appellants thus have no right to appeal. The orders striking the objections should be affirmed and their appeals dismissed.

### A. To Appeal, Appellants Must Show the District Court Abused its Discretion in Striking Their Objections.

"[O]nly parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." *Devlin*, 536 U.S. at 7. Although an absent class member is not required to intervene as a party to appeal, they are only "allowed to appeal that aspect of the District Court's order that affects him—the District Court's decision to disregard his objections." *Id.* at 9. Importantly, though, "the power to appeal is limited to those nonnamed class members who have objected during the fairness hearing." *Id.* at 11. This is a "narrow exception[]" to the general rule that "only parties . . . have the right to appeal an adverse judgment." *In re*

*UnitedHealth Group Inc. S'holder Derivative Litig.*, 631 F.3d 913, 916 (8th Cir. 2011). So, "at a minimum," for an unnamed class member to appeal he or she "must file a timely and proper objection with the district court before appealing[.]" *Id.*

A deficient, like a subsequently withdrawn, objection does not provide an objector with a right to appeal. *See, e.g.*, *Farber v. Crestwood Midstream Partners L.P.*, 863 F.3d 410, 418-19 (5th Cir. 2017) (affirming dismissal of appeal based on "procedurally deficient objection"); *In re Plastics Additives Antitrust Litig.*, No. 08-3358, 2009 WL 405522, at *1 (3d Cir. Feb. 19, 2009) (right to appeal depends on "properly raised objections"); *In re Integra Realty Res., Inc.,* 354 F.3d 1246, 1257–58 (10th Cir. 2004) (class member may not appeal because "his written objection does not meet the district court's stated requirements for objecting at the fairness hearing").

It follows that an objection properly stricken—including as a sanction or for bad faith—precludes the objector from appealing unless he or she shows the district court erred in striking the objection. *See, e.g., In re Plastics Additives Antitrust Litig.*, 2009 WL 405522, at *1 (rejecting appeal from denial of objection to settlement on the merits but only after

concluding appellant had not withdrawn his objection); *accord Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.,* 378 F.3d 774, 781 (8th Cir. 2004) (refusing to "consider the merits" when the district court properly denied a motion to intervene because appellant "may not appeal the adverse judgment"); *United States v. City of Oakland,* 958 F.2d 300, 301 (9th Cir. 1992) (holding that because appellant failed to appeal denial of motion for leave to intervene, "they were never made parties to the litigation" and therefore could not appeal the substance of the underlying judgment).[123]

Appellants fail to meet that burden.

## B. The District Court Did Not Abuse its Discretion in Striking the Objections.

The Court reviews an order granting a "motion to strike for abuse of discretion." *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 829 (8th Cir. 2014), as corrected (July 15, 2014); *accord Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991) (reviewing "a court's imposition of sanctions under its

---

[123] Being a "party" is a threshold requirement for appeal but it "does not implicate" jurisdiction or standing. *Devlin,* 536 U.S. at 6. Dismissal is the appropriate remedy. *See Marino v. Ortiz*, 484 U.S. 301, 304 (1988) (affirming dismissal of appeal brought by "petitioners [who] were not parties to the underlying lawsuit").

inherent power for abuse of discretion"); *Nationwide Ins. Co. v. Cent. Missouri Elec. Co-op., Inc.*, 278 F.3d 742, 748 (8th Cir. 2001) (ruling on motion to strike under Rule 12(f) is "review[ed] . . . for an abuse of discretion"). The district court did not abuse its discretion here.

In a class action, the district court has "a duty to the silent majority as well as the vocal minority." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995). It is equally obliged to protect the class from "frivolous objectors (who may impede or delay valuable compensation to others)" as from "overeager settlements." *1988 Trust for Children Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 521 (4th Cir. 2022). It is thus "important for district courts to screen out improper objections because objectors can, by holding up a settlement for the rest of the class, essentially extort a settlement of even unmeritorious objections." *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84, n.3 (1st Cir. 2015).

The district court acted appropriately here.

### 1. Connie Pentz waived any challenge to her objection being stricken.

Connie Pentz waived any opposition to her objection being stricken. Unless the appellant invokes plain error review (which has not occurred), this Court does "not consider an argument raised for the first time on

appeal." *Burbridge v. City of St. Louis,* 2 F.4th 774, 783 (8th Cir. 2021) (quotation omitted). Ms. Pentz's objection was stricken for refusing to participate in court-ordered discovery. But she also never opposed (by seeking a protective order or filing any sort of response) either the deposition itself or *the motion to strike her objection*. P-Add. 56; P-App. 93; R. Doc. 233, at 4. Because Ms. Pentz fails to even address her waiver below, and could not surmount any standard of review, her appeal should be summarily dismissed. Moreover, Ms. Pentz should not be afforded any leeway as a purportedly "pro se" objector given John Pentz's admission that he "produced" her objection. Pentz Br. 10 ("Mrs. Pentz' objection was very clear and straightforward, although it contains case citations *and was clearly produced with the assistance of an attorney, the undersigned.*") (emphasis added).

Nonetheless, even if she had properly presented to the district court the arguments she now offers on appeal, Ms. Pentz fails to show reversible error. The district court was well within its discretion to impose sanctions where she "failed to cooperate with the plaintiffs' efforts to secure discovery." *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 671 (9th Cir. 2020). Class counsel sought the deposition, in part, to establish that

38

her son, John Pentz, ghost-wrote the objection and represented her, which—given her failure to identify him as her counsel—would have presented an independent ground for the district court to find the objection "waived" under its preliminary approval order. H-App. 660-61; R. Doc. 158-5, at 13-14; *see also* PA-App. 9; R. Doc. 162, at 9. John Pentz's admission on appeal that he did, in fact, ghost-write the objection only serves as an additional reason to question the motivations underpinning that objection and affirm the district court.

Ms. Pentz asserts, however, that she and Class counsel were simply "unable to agree on an acceptable time" for her deposition and that Class counsel "never served [her] with a subpoena." Pentz Br. 10. That assertion contradicts the record, which shows Ms. Pentz refused to communicate, repeatedly evaded service of process, and had received the subpoena left at her home when she stated she would not sit for a deposition. PA-App. 23-26; R. Doc. 209-1, at 2-5.

Ms. Pentz also complains that a deposition was unnecessary and would have imposed an undue burden, Pentz Br. 20-22, but did not preserve either argument below. In any event, whether discovery is permissible is reviewed "very deferential[ly]" and will not be reversed

"absent a gross abuse of discretion resulting in fundamental unfairness[.]" *Sheets v. Butera*, 389 F.3d 772, 780 (8th Cir. 2004). Pentz cannot meet that standard. *See In re Equifax Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247, 1266-67 (11th Cir. 2021) ("*Equifax*") (district court has "broad discretion" to permit discovery, including depositions, to establish the objector's "relationship[] with the professional objector counsel"); *see also Granillo v. FCA US LLC*, No. 16-153(FLW)(DEA), 2018 WL 4676057, at *7 (D.N.J. Sept. 28, 2018) ("Courts around the country have approved . . . depositions of objectors who have voluntarily inserted themselves into an action[.]").

Ms. Pentz's citation to a decision governing personal jurisdiction over absent class members, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), is inapposite. Pentz Br. 21-22. *Phillips Petroleum* held that a court can exercise personal jurisdiction over out-of-state class members if they receive minimal due process, such as notice and the opportunity to opt out. 472 U.S. at 812. Due process was satisfied here because Ms. Pentz received notice and an opportunity to opt out, chose not to opt out, and instead chose to object, thus voluntarily attempting to make herself

a party to the action (but, ultimately, not a proper party to an appeal). *See id.*

A party who fails "to appear for that person's deposition" is subject to the district court's sanctions. Fed. R. Civ. P. 37(d)(1)(A)(i); *see also Chambers*, 980 F.3d at 671; *In re Hydroxycut Mktg. and Sales Pracs. Litig.*, Nos. 09CV1088 BTM(KSC), 09CV2087 BTM(KSC), 2013 WL 12110505, at *2 (S.D. Cal. Oct. 24, 2013) (striking objection where objector refused to appear at court-ordered hearing). Ms. Pentz's objection was properly stricken, so her appeal of the fee award should be dismissed.

## 2. Hampe fails to show the district court erred in striking her objection.

A district court has plenary authority to regulate its proceedings and sanction bad faith. In this context, its authority derives from several traditional sources. First, the district court has inherent power to "fill in the interstices" between the Federal Rules of Civil Procedure and other governing law, *Chambers*, 501 U.S. at 46, so as "to achieve [the] orderly and expeditious disposition" of a case. *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962). That inherent authority "is an independent basis for sanctioning bad faith conduct in litigation." *First Bank of Marietta v.*

*Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511 (6th Cir. 2002). Second, in class actions, Rule 23(d)(1)(A) expressly confers broad authority on the district court to "issue orders" that "determine the course of proceedings or prescribe measures to prevent undue repetition or complication in the presentation of evidence or argument." Third, Rule 12(f) permits the district court to "strike from a pleading any "impertinent" matter.

Each of these sources of authority gave the district court the discretion to strike an objection it conclusively found was made in "bad faith." Hampe does not contest the district court's conclusion that the Bandas Firm has engaged in a pattern of making such objections. H-Add. 9-10; H-App. 1285-86; R. Doc. 234, at 9-10.[124] Rather, she argues Rule

---

[124] Hampe also impugns the district court's integrity by characterizing its orders as "ghostwritten" by Class counsel. Hampe Br. 51. But both sides submitted proposed orders, which the court invited. H-Add. 2; H-App. 1278; R. Doc. 234, at 2, n.2. Moreover, as the pending motion to supplement the record shows, the district court did not adopt the proposed order wholesale. And it took several months from submission to issue the orders involved here. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1149–50 (8th Cir. 1999) (noting that the "district court in our case rejected several pages of findings proposed by Amoco and the class counsel, an act that reflects more than just a cursory analysis and interpretation."); *Equifax*, 999 F.3d at 1269 (rejecting similar complaint that order was "ghostwritten).

12(f) does not apply because her objection was not a "pleading" as defined by Rule 7 and not subject to being stricken under Rule 12(f). Hampe Br. 26. That is doubtful because, as the district court explained, an objection is the *only* pleading made by an absent class member. H-Add. 10; H-App. 1286; R. Doc. 234, at 10. But even if this argument had merit, it would still fail to explain why the district court lacked the inherent authority to "fill in the interstices" of the Federal Rules in this circumstance. *Chambers*, 501 U.S. at 46. And this Court "may affirm the judgment on any basis disclosed in the record, whether or not the district court agreed with or even addressed that ground." *Palava v. I.N.S.*, 287 F.3d 690, 693 (8th Cir. 2002).

The district court's underlying "factual determination" of "bad faith" may be "reversed only if clearly erroneous." *Actors' Equity Ass'n v. Am. Dinner Theatre Inst.,* 802 F.2d 1038, 1042 (8th Cir. 1986). And "great weight is accorded [to the district court's] views because [it] is exposed to the litigants, and their strategies, positions and proofs." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) (cleaned up). None of Hampe's arguments surmount that high hurdle.

Contrary to Hampe's arguments, the district court *did* find bad faith by Hampe and the Bandas Firm in this litigation: "the objection filed by Ms. Hampe through the Bandas Firm [was] not made in good faith." H-Add. 10; H-App. 1286; R. Doc. 234, at 10. That finding was not clear error. Hampe supposedly hired the Bandas Firm, which already had an unrefuted history of filing vexatious objections on behalf of her husband, and she is closely related to Bandas, who is the firm's principal and represented her in objecting in a previous class action. She admitted that the fee request disclosed in the Class notice did not concern her, even though it was 7% higher than the amount she now challenges. Rather, she was initially concerned about the size of the cash relief, and only after hiring the Bandas Firm did she abandon that argument to instead challenge the smaller fee requested. H-App. 862-65; R. Doc. 208-1, at 19-22.

Hampe now primarily disputes the district court's finding that the long history of misconduct by Bandas and the Bandas Firm, including the injunction against it, should not have been imputed to her attorneys, Clore and West, who are employed by the firm. But she testified that she hired the Bandas Firm (not Clore and West), of which Bandas (her

brother-in-law) is the principal. H-Add. 6-7; H-App. 1282-83; R. Doc. 234, at 6-7 (citing R. Doc. 208-1, at 7-9). Other courts have likewise rejected this attempted Bandas/Clore side-step maneuver. *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 15-7658(MAS)(LHG), 2020 WL 7585741, at *5 (D.N.J. Dec. 21, 2020) (noting that while most "if not all of [the courts'] criticisms have focused on Bandas and the Bandas firm" rather than on "Clore personally," that "does not mean that Clore is somehow exonerated"). And the federal injunction was entered against the Bandas Firm itself, in a case where the firm agreed that, as long as they "continue to practice class litigation, they will carry the tattoo of [the court's injunction] with them." H-App. 872; R. Doc. 802-2, at 3. Bandas, the sole owner of his firm,[125] cannot simply erase the firm's ugly history by dispatching new lieutenants to engage in the same sanctioned tactics.

Hampe also insists the district court adopted factual errors submitted by Class counsel in their proposed order, including in discussing a case relied upon by Hampe (in which Clore was also counsel) where the Bandas Firm secured a $900,000 fee to dismiss its appeal of a $1.51 billion class-action settlement ("*Syngenta*") where it made the same

---

[125]    H-App. 848; R. Doc. 208-1, at 5.

"mega-fund" arguments it insists upon here. Hampe Br. 52. Hampe argues that the district court failed to acknowledge Clore (and the two other objectors in that case) negotiated $3 million back to the *Syngenta* class (out of a $503.3 million (33.33%) attorneys' fee award).[126] *Id.* But Hampe ignores what the district court actually found persuasive in "discount[ing] the Bandas Firm's emphasis on its role" in *Syngenta*: "The fact that the Bandas Firm [including Clore] *conditioned withdrawal of its appeal . . .* on approval of its requested $900,000 in attorneys' fees [which] *suggests that the Bandas Firm's motive was not securing a benefit for the settlement class but securing a fee award.*" H-Add. 8; H-App. 1284; R. Doc. 234, at 8 (emphasis added). In other words, the Bandas Firm conditioned class benefits on its own fees—indeed, not merely on whether the district

---

[126] Even the $3 million returned to the Class was paid by class counsel from the interest they had earned on their fee and expense award while they defended the appeal prosecuted by the Bandas Firm and others. The district court correctly noted that, while holding up relief to the class in *Syngenta*, Bandas and Clore failed to achieve any reduction in the total attorneys' fees awarded in exchange for their compensation. H-Add. 8-9; H-App. 1284-85, R. Doc. 234, at 8-9; *see also* H-App. 996; R. Doc. 224, at 19. *See In re Syngenta MIR 162 Corn Litig.*, No. 2:14-md-02591-JWL-JPO, R. Doc. 4278, at 3 (D. Kan. Dec. 9, 2019) ("Settlement Class Counsel have agreed that at least $3 million *in interest* that has been earned on just the Fee and Expense award only . . . will be distributed to the class[.]" (cleaned up).

46

court granted it *any* attorneys' fees, but on whether the court granted it *all* the fees it requested. "If the Bandas Firm's interest was securing additional relief for the settlement class, it could have secured that relief independent of whether the district court agreed to award it attorneys' fees." H-Add. 8; H-App. 1284; R. Doc. 234, at 8. Thus, the conduct in *Syngenta* supports the district court's conclusion that Bandas and his firm routinely file improper objections solely to extract a fee.

Finally, Hampe takes issue with the assertion that her appeal is holding up disbursement of the Class benefits, insisting that Class counsel could start distributing relief immediately. Hampe Br. 56-57. But a court cannot "require the parties to accept a settlement to which they have not agreed." *Rawa*, 934 F.3d at 871. *See also* H-App. 540-41; R. Doc.158-1, at 20-21 (any "material change" to the final approval order suspends the effective date of the Settlement). T-Mobile is not required to fund the Settlement until there is finality, so there is nothing for Class counsel to distribute yet. And, even if funded, without knowing the final size of the cash fund available, it would be at best imprudent, and at worst a disservice to the Class, to start distributing money because

additional money may not be administratively feasible or practical to distribute.

By striking the objection of a professional and serial objector repeatedly sanctioned for "hijacking settlements," the district court acted well within its discretion as a fiduciary to the unnamed Class members, nearly all of whom had no objection to the proposed Settlement or to attorneys' fees. That order should be affirmed and Hampe's appeal of the fee award dismissed.

## II. EVEN IF THEIR ARGUMENTS ARE CONSIDERED, APPELLANTS FAIL TO SHOW THE DISTRICT COURT ABUSED ITS DISCRETION IN AWARDING ATTORNEYS' FEES.

When an individual's PII is stolen, the speed with which prophylactic relief is made available is critical because the "negative effects of delay are especially acute" to the victims. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 318 (N.D. Cal. 2018). Here, through the appointment of interim Class counsel with substantial experience in data-breach matters, the district court assured that the Data Breach victims had skilled counsel who could litigate or resolve the case as efficiently and successfully as possible. Based on their experience and reputation in data-breach litigation and the strength of the substantial

allegations they marshalled quickly, and with a great expenditure of work in a short amount of time, Class counsel expediently secured extraordinary relief for the Class. H-Add. 29, 45; H-App. 1305, 1321; R. Doc. 235, at 17, 33.

The total value of the Settlement obtained is at least $500 million, inclusive of a non-reversionary $350 million cash fund, making it one of the largest data-breach settlements ever. H-Add. 42, 54; H-App. 1318, 1330; R. Doc. 235, at 30, 42. And this significantly undervalues the Settlement, as it does not account for the full retail value of the credit monitoring, insurance products, and credit restoration products available to all class members. *See Equifax*, 1:17-md-2800-TWT, 2020 WL 256132, at *7 (N.D. Ga. Mar 17, 2020) (noting benefit to class included retail value of credit monitoring) (*aff'd in part, rev'd in part on other grounds*, 999 F.3d 1247 (11th Cir. 2021). Despite the record-setting relief obtained by Class counsel, Appellants argue paradoxically that counsel's experience and efficient delivery of that relief required the district court to heavily discount the attorneys' fees they would have earned if they had instead been less experienced and engaged in protracted litigation for many years. Essentially, they argue that Class counsel should be penalized not

for a lack of success but because they were too successful. As explained below, the district court acted well within its discretion to disagree with these arguments and to apply this Circuit's traditional test for the award of attorneys' fees.

### A. This Court Reviews the Fee Award Deferentially, and Appellants Fail to Show that the District Court Committed Any Error of Law.

#### 1. Appellants are not entitled to *de novo* review.

An award of class-action attorneys' fees is reviewed for abuse of discretion—indeed, the district court has "significant discretion." *See, e.g.*, *In re Life Time Fitness, Inc., Telephone Consumer Protection Act (TCPA) Litig.*, 847 F.3d 619, 622 (8th Cir. 2017); *Petrovic*, 200 F.3d at 1156. Nonetheless, Appellants demand *de novo* review, urging that the district court applied the wrong methodology by failing sufficiently to consider that this was a "mega-fund" settlement. Hampe Br. 28.

But as the Seventh Circuit put it, "whether the district court's legal analysis and method conformed to circuit law" is reviewed *de novo*, while its selection of "a reasonable fee," which "will often fall within a broad range," is reviewed deferentially. *In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797, 801, 802 (7th Cir. 2023) (cleaned up). In this Circuit, there is no dispute that "[t]he district court has discretion to use either a

50

lodestar or percentage-of-the-fund method in determining an appropriate recovery, 'and the ultimate reasonableness of the award is evaluated by considering relevant factors from the twelve factors listed in *Johnson*.'" *Rawa*, 934 F.3d at 870 (quoting *In re Target Corp., Customer Data Sec. Breach Litig.*, 892 F.3d 968, 977 (8th Cir. 2018)); *see also Life Time*, 847 F.3d at 623 (the district court "did not abuse its significant discretion by electing to use the percentage-of-the-benefit method"); *ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.*, 59 F.4th 905, 919 (8th Cir. 2023) (reviewing for abuse of discretion "the procedure used by the district court to determine reasonableness" of attorneys' fees). Nor is there any dispute that the district court applied the "*Johnson* factors [in] finding that the requested fee is reasonable and appropriate." H-Add. 40-59; H-App. 1316-35; R. Doc 235, at 28-47. So, the district court's methodology indisputably "conformed to circuit law," *Broiler Chicken,* 80 F.4th at 801 (cleaned up), and Appellants' complaints are not truly methodological.

Indeed, Appellants argue that, even though the district court considered the size of the Settlement when it awarded fees, it did not give sufficient *weight* to that factor in selecting what percentage to award.

*See, e.g.*, Hampe Br. 25, 34-35. They also challenge the weight that the district court gave to its lodestar cross-check (Hampe Br. 46-48)—a factor that cannot be methodological, since such a crosscheck is "not required" under this Circuit's binding precedent. *Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017). If the weight given to particular factors is challenged, however, this Court reverses only if the district court "commits a clear error of judgment," which is an application of the abuse-of-discretion standard. *Aaron v. Target Corp.*, 357 F.3d 768, 774 (8th Cir. 2004) (reversal requires "clear error of judgment in the course of weighing proper factors.")

At times, Appellants seem to make a different argument—namely, that the size of the Settlement here removed the district court's discretion to award a percentage fee above 12%. *See* Hampe Br. 33-34 (arguing that the court was required to choose a fee of 12% or below); Pentz Br. 11 (arguing that if the settlement exceeds $175 million, a fee less than 15% is warranted). But if an appellant could circumvent deferential review simply by proposing a new legal rule that restricts discretion, that would eviscerate abuse-of-discretion review. *See Broiler Chicken*, 80 F.4th at

802 ("[A] reasonable fee will often fall within a broad range") (cleaned up).

Tellingly, to support *de novo* review, Hampe cites *no* case involving this Court's longstanding attorney-fee standard. *See Timber Ridge Escapes, LLC v. Quality Structures of Ark., LCC*, 6 F.4th 781, 787 n.5 (8th Cir. 2021) (stating that the "methodology in calculating damages" in an ERISA case "could be subject to *de novo* review"); *Tussey v. ABB, Inc.*, 746 F.3d 327, 338-39 (8th Cir. 2014) (ERISA damages); *Nygaard v. Taylor*, 78 F.4th 995, 999 (8th Cir. 2023) (statutory interpretation).

Because *de novo* review is not proper, Appellants must overcome the "substantial deference [given] to a district court's determinations, in light of the district court's superior understanding of the litigation." *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 871 (8th Cir. 2014). They cannot do so.

### 2. No other circuit has adopted Appellants' proposed legal rule, which is based on a misreading of other circuits' precedent.

Notwithstanding their attempt to circumvent the standard of review, Appellants' insistence that the district court's fee analysis departed from the "majority" view of other Circuits' consideration of so-

called "mega-fund" settlements is also wrong. Hampe Br. 25; Pentz. Br. 11. In fact, every other Circuit to have considered their arguments has "cautioned against [such] overly formulaic approaches in assessing and determining the amounts and reasonableness of attorneys' fees." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005) (rejecting argument that "district court must apply a declining percentage reduction in every settlement involving a sizable fund"); *see also In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1197 (10th Cir. 2023) (agreeing with the Third Circuit); *Equifax*, 999 F.3d at 1280 (declining to "require the [d]istrict court to expressly consider the economies of scale in a megafund case" where the *Johnson* "factors fairly capture many [of these] considerations"); *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 933 (9th Cir. 2020) (declining to "adopt [such] a bright line rule" that "percentage-based fee awards *must* decline as the size of the class recovery increases"); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 717-18 (7th Cir. 2001) (declining invitation to adopt bright line rule in "mega

fund" cases).[127] Appellants' proposed "methodological" amendment to the *Johnson* factors would thus be novel, not just here, but everywhere.

Despite this, Appellants wrongly contend that the "Second, Seventh, Ninth and Federal Circuits adjust methodology for the economies of scale." Hampe Br. 31. As noted, however, the Ninth and Seventh Circuits have explicitly refused to do just that. *See also In re Broiler Chicken*, 80 F.4th at 804 ("It is true that this court has rejected the application of a megafund rule."). And their citations to the Second and Federal Circuit fare no better.

Hampe cites *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), where the Second Circuit merely affirmed the district court's *discretion* to consider economies of scale in awarding attorneys' fees in a $3.05 *billion* settlement fund. *Id.* at 122. The methodology required in the Second Circuit, however, remains "based on the scrutiny of the unique circumstances of each case," *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 53 (2d Cir. 2000), as it does in this Circuit.

---

[127]   Notably, in two of these cases, the Bandas Law Firm, including Clore, were counsel of record raising these same unsuccessful arguments. *See In re Equifax*, 999 F.3d at 1255; *In re Optical Disk Drive*, 959 F.3d at 922–25.

Likewise, the Federal Circuit (which, given its jurisdiction, infrequently encounters class actions) merely cited the Second Circuit's statement that where "economies of scale *could cause windfalls* in common fund cases courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable." *Health Republic Ins. Co. v. United States,* 58 F.4th 1365, 1347 (Fed. Cir. 2023) (emphasis added) (quoting *Wal-Mart Stores,* 396 F.3d at 122). Again, as noted above and below, the 22.5% fee award here *is* smaller than typically awarded and not a windfall given the extraordinary result.

Moreover, *Health Republic* involved unique facts absent here: the Federal Circuit held that the claims court erred by failing to consider that the $185 million fee award resulted in a lodestar multiplier of 18-19 because the class notice "unequivocally stated that a lodestar cross-check would be conducted by the [trial court] in its determination of a reasonable attorney's fee." *Id.* at 1373. This was "legal error" not because the multiplier of 18-19 (double the multiplier here) was per se impermissible or even because a lodestar cross-check was always required. Instead, it was error because it breached the unique promise given to class members who affirmatively opted into the class based on

that notice. *Id.* Indeed, the court expressly distinguished precedent in many other circuits—including this Court—that a crosscheck was not required because those cases did not involve a "class notice like the ones distributed" there. *Id.* (distinguishing *Keil*, 862 F.3d at 701). And, while the court referenced the claims court's failure to give "consideration or weight to pertinent principles and to consensus norms," *id.* at 1374, the district court here considered and weighed those precise issues. H-Add. 47-49; H-App. 1323-25; R. Doc. 235, at 35-37.

This appeal involves no methodological error because the district court applied this Circuit's precedent in weighing all the relevant factors.

## B. The District Court Did Not Abuse Its Discretion in Weighing the *Johnson* Factors.

Without methodological error to support their appeal, Appellants are left with conclusory criticisms of the evidence. *See* Hampe Br. 50-51. Here, too, however, the district court has wide discretion, and this Court has consistently rejected similar requests to cabin discretion with strict rules. For example: it has turned down an invitation to "establish a new 25% benchmark" for percentage fees, instead reaffirming its "settled practice of leaving decisions regarding attorneys' fees to the reasonable discretion of district courts." *Huyer v. Buckley*, 849 F.3d 395, 399 n.3 (8th

Cir. 2017). It has rejected the argument that certain kinds of class actions are subject to a cap on lodestar multipliers. *Keil*, 862 F.3d at 702 (rejecting cap on multipliers "in consumer class actions"). It has declined to require courts to lower fees if a class-action settlement has a low claims rate. *Id.* at 701. And it has refused to require administrative costs to be excluded from a settlement fund for purposes of calculating a percentage fee. *Target*, 892 F.3d at 976 (citing cases).

Indeed, the district court is not even required to consider all the *Johnson* factors, since "rarely are all of the *Johnson* factors applicable" to "a common fund situation." *Keil*, 862 F.3d at 703 (quoting *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993)). And, as noted, the relative weight of each factor is also committed to the district court's sound discretion. *See Rawa*, 934 F.3d at 870 (rejecting a challenge to "the district court's weighing of the *Johnson* factors").

Here, the district court weighed each factor and concluded that a fee equal to 22.5% of $350 million or 15.75% of $500 million was reasonable. Appellants fail to show abuse of discretion.

1. **Hampe's fact-based challenges to the *Johnson* factors fall well short of showing clear error by the district court.**

Hampe raises several challenges to the district court's analysis of certain *Johnson* factors, but they are all flawed—certainly, none show clear error.

First, Hampe ignores that the "degree of success obtained" has been repeatedly identified as the "most critical factor"—which of course is eminently sensible when fees are awarded as a percentage of the recovery. *See Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969, 975 (8th Cir. 2016) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)); *see also Target*, 892 F.3d at 977 n.7 (characterizing this *Johnson* factor as "the amount involved and the results obtained"). The district court found the Settlement extraordinary and expediently obtained given the litigation risks Class counsel faced. H-Add. 29, 45; H-App. 1305, 1321; R. Doc. 235, at 17, 33. Hampe's criticisms are baseless: the Settlement is extraordinary in gross terms, on a per-capita basis, and compared to other large data-breach settlements (including ones reached after protracted litigation).

The Settlement "provides twice as much recovery" per Class member as *Equifax* and is "three times the size of the fund achieved for a similarly sized class in *Anthem*." H-Add. 42; H-App. 1318; R. Doc. 235, at 30. Hampe's only rejoinder on appeal is to claim that Equifax was required to spend more to improve its data security than T-Mobile (contradicting her argument that the district court should not have considered the additional security spending in evaluating the fee request). But she has no evidence to suggest that spending obligations for two companies of different sizes with different data systems and networks and two different operations are appropriately compared. In contrast, the per-capita cash funds are easily compared and show that the size of the Settlement was not derived solely from the number of Class members (as Hampe argues), but from the results obtained by Class counsel at the bargaining table. *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 Fed. Appx. 651, 654 (9th Cir. 2019) (affirming a "finding that the large size of the settlement fund did not warrant a reduction of the 20 percent fee award" because it was "counsel's efforts [that] led to the 'exceptional mega-fund results.'").

Next, Hampe argues the case did not present any novel or difficult

questions "considering the same class counsel followed a well-established blueprint for success . . . established in . . . other data breach settlements." Hampe Br. 50. This argument should be rejected. Neither objector points to anything in the record to support the bald assertion that Class counsel secured the Settlement merely by coasting on past success. *See, e.g.*, *Bush v. Marshalltown Med. & Surgical Ctr.*, 123 F.3d 1130, 1134 (8th Cir. 1997) (noting that the "party seeking to have" a district court's factual "findings set aside bears the burden of showing clear error").

But Hampe's argument also fails to acknowledge that "plaintiffs face[d] significant risks" including, uniquely, the potential enforcement of arbitration clauses. H-Add. 31; H-App. 1307; R. Doc. 235, at 19. Moreover, it is well recognized that the application of law "in data breach litigation remains uncertain and the applicable legal principles have continued to evolve." H-Add. 44; H-App. 1320; R. Doc. 235, at 32 (quoting *Equifax*, 2020 WL 256132, at *32).

Ordinarily, clients pay *more* to hire attorneys with subject-matter expertise and a track record of successful outcomes, yet Hampe advocates the reverse. To the extent Hampe argues that any efficiencies due to

Counsel's experience should have been "passed along to the clients," (Hampe Br. 32-33), the district court recognized that those efficiencies *were* passed along, as "the timeliness with which Class Counsel obtained" forward-looking, protective remedies was "independently valuable" to the Class. H-Add. 45; H-App. 1321; R. Doc. 235, at 33. And it is undisputed that Class counsel sought a fee below the typical percentage in class actions and below even what the Settlement Agreement allowed.

Hampe briefly contests the district court's application of the "time and labor" factor but only with reference to the lodestar, Hampe Br. 50, which as explained below was not error. The amount of time expended in a short period to secure the Settlement was a "significant investment of time weighing in favor of the requested fee," and requiring "continued litigation and a larger lodestar (and therefore smaller lodestar multiplier)" would not have created a superior outcome for the Class. H-Add. 45; H-App. 1321; R. Doc. 235, at 33. *See also Life Time*, 847 F.3d at 623 (affirming fee award in part based on the "expeditious settlement of the class claims").

Most of Hampe's remaining arguments (Hampe Br. 35, 50) challenge the district court's finding that "the requested fee is

comparable to or less than awards in other class actions that have resulted in similar settlements." H-Add. 47; H-App. 1323; R. Doc. 235, at 35. For this, she insists the district court had no discretion to depart from what the 2010 Eisenberg & Miller study found to be the mean percentage awarded in settlements over $175 million. Hampe Br. 30, 33-34. While the district court acknowledged the study, it clearly rejected Hampe's myopic view of its importance in favor of other, more salient information, including other studies it gave more weight. H-Add. 53-55; H-App. 1329-1331; R. Doc. 235, at 41-43.

Instead of relying on a single 14-year-old study, the district court considered several more relevant data points:

- that the percentage requested was already 13% lower than the mean percentage awarded to contingency counsel in class actions overall;[128]

---

[128]    H-Add. 47; H-App. 1323; R. Doc. 235, at 35. This was supported by the Fitzpatrick declaration. H-App. 767; R. Doc. 179-2, at 11.

- that the percentage awarded was also "below the 23.5% average fee awarded in the five largest data breach class settlements to date";[129] and

- that courts have awarded larger percentages,[130] including in settlements involving so-called "mega funds."[131]

---

[129]    H-Add. 48; H-App. 1324; R. Doc. 235, at 36. Hampe argues three of these "settlements were significantly smaller in size," Hampe Br. 35, but omits that the percentage requested and awarded here was lower than in two of the cited cases. H-Add. 48, n.5; H-App. 1324, n.5; R. Doc. 235, at 36 n.5 (27% of a $115 million and 28% of a $190 million settlement versus 22.5% of a $350 million settlement here).

[130]    H-Add. 47; H-App. 1323; R. Doc. 235, at 35 (citing several exemplary cases in this Circuit awarding 30% to 33.33% of $60 to $86 million funds).

[131]    *See, e.g., In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1110 (D. Kan. 2018) (33.33% of $1.5 billion); *In re Urethane Antitrust Litig.*, No. 04 Civ. 1616, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016) (33.33% of $835 million); *Dahl v. Bain Capital Partners*, LLC, No. 07-cv-12388, Dkt. No. 1095 (D. Mass. Feb. 2, 2015 (33% of $590.5 million); *In re Initial Public Offering Securities Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (33% of $510 million); *In re Vitamins Antitrust Litig.*, No. Misc. 99-197 (TFH), 2001 WL 34312839, at *10, 14 (D.D.C. July 16, 2001) (34% of $359 million); *Hale v. State Farm*, No. 12-00660-DRH-SCW (S.D. Ill. Dec. 16, 2018) (33.33% of $250 million); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340-SLR, Dkt. No. 543 (D. Del. 2009) (33% of $250 million). *See also* H-App. 771-72; R. Doc. 179-2, at 15-16 ("the fee request here would land well within the range of fee awards in comparable large settlements").

The district court gave more weight to the more recent Fitzpatrick study—a study upon which dozens of other courts have also relied. H-App. 760, at n.1; R. Doc. 179-2, at 4, n.1. That study looked at a more comparable range of settlement sizes ($250 million to $500 million) than Eisenberg, which included *all* settlements above $175 million, including billion-dollar settlements. The Fitzpatrick study showed "mean and median fees . . . are 17.8% and 19.5%" respectively. H-Add. 48; H-App. 1330; R. Doc. 235, at 36. While 22.5% is above the mean, 15.75% of $500 million is well below it. H-App. 769; R. Doc. 179-2, at 13. Moreover, given the "high degree of variability and imprecision" that would result in only considering the average percentage of a single study, particularly one like the 2010 Eisenberg & Miller study that fails to limit its conclusions to settlements of materially similar size, the district court held it could not be given controlling weight, as Appellants insisted. H-Add. 54; H-App. 1330; R. Doc. 235, at 42.

In fact, Appellants failed to show that even the 2010 Eisenberg & Miller study mandated selection of a lower percentage here. Its authors found that reasonable fees often fall within one to two standard deviations above the mean, Theodore Eisenberg & Geoffrey P. Miller,

*Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical L. Stud. 27, 74 (2004), with each deviation being a significant 7.9%.[132] Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action. Settlements: 1993–2008*, 7 J. Empirical L. Stud. 248, 265 tbl. 7 (2010). Two standard deviations (27.8%) is greater than either 22.5% of the cash fund or 15.75% of T-Mobile's commitment to the Settlement.

Moreover, Appellants arguments give *no* weight to the $150 million security spending obtained by Class counsel. The district court emphasized this point. H-Add. 43, 48-49, 53-54; H-App. 1319, 1324-25, 1329-30; R. Doc. 235, at 31, 36-37, 41-42. Even if the entire $150 million is not added to the $350 million to calculate the size of the fund,[133] Hampe

---

[132] A standard deviation measures dispersion around the mean. A larger deviation means wider dispersion. *Final Report and Recommendations of the Eighth Circuit Gender Fairness Task Force*, 31 Creighton L. Rev. 9, 179 (1997).

[133] Hampe's arguments against including the $150 million in the fund size are exceptionally weak. Hampe Br. 48-49. In the first case she cites, *Farrell v. Bank of America Corp. N.A.,* 827 Fed. Appx. 628, 634 (9th Cir. 2020), Hampe quotes from the *dissent* while inaccurately attributing those quotes to the majority. The majority took "a different view of the value of the injunctive relief." *Id.* In the other case, the court found the injunctive relief "to be largely precatory in nature." *Staton v. Boeing,* 327 F.3d 938, 974 (9th Cir. 2003). Here, the $150 million in spending is real:

concedes that the law "allow[s] for consideration of injunctive relief *in determining what percentage to award*." Hampe Br. 49 (emphasis added). That concession reflects Circuit precedent. In *Petrovic*, this Court held that a 24% fee "was reasonable, particularly given that significant nonmonetary benefits are also being given to the class." 200 F.3d at 1157. And the more fundamental point is incontestable: however valued, the extra $150 million data security spend has significant value to the Class, making the effective fee percentage lower than 22.5%.

It was the district court's province to weigh all this evidence and each *Johnson* factor. Appellants cannot show the court ignored anything relevant. Given that the percentage awarded here was below permissible percentages in settlements involving smaller funds, it necessarily accounted for any "economies of scale" or other factors Hampe insists the district court should have afforded more weight, particularly when the Settlement here, despite being obtained expediently, was significantly better compared to similar cases.

---

T-Mobile *must* spend "at least $150 million for data security and related technology . . . above its previously budgeted baseline." H-App. 539; R. Doc. 158-1, at 19.

## 2. The lodestar cross-check supports the fee award and does not show an abuse of discretion.

Most of Hampe's arguments, and all of Ms. Pentz's independent arguments, amount to the same criticism—that the awarded fee is excessive in relation to Class counsel's lodestar. Hampe Br. 50-51; Pentz Br. 13-15. But a "lodestar cross-check does not trump the primary reliance on the percentage of common fund method," *In re Rite Aid*, 396 F.3d at 307, which far better aligns counsel and the class's interests and mirrors the competitive market for contingent legal work. *See Wal-Mart*, 396 F.3d at 121 (percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation") (cleaned up); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C. Cir. 1993) ("percentage-of-the-fund approach most closely approximates the manner in which attorneys are compensated in the marketplace for these types of cases").

As explained above, the percentage awarded here is justified by the *Johnson* factors. And a lodestar cross-check is neither a factor in that analysis nor "required" under this Circuit's precedent. *Keil,* 862 F.3d at 701. Nonetheless, the district court considered it, concluding that the 9.6 multiplier did not result in an unearned windfall, particularly weighed

against the extraordinary Settlement achieved so quickly for the Class. H-Add. 49-50; H-App. 1325-26; R. Doc. 235, at 37-38. To "overemphasize the amount of hours counsel expended on this litigation [might] penalize counsel for obtaining remarkable relief quickly[.]" H-Add. 49; H-App. 1325; R. Doc. 235, at 37 (citing *Rawa*, 934 F.3d at 870).

These conclusions were within the district court's broad discretion. *See In re Rite Aid*, 396 F.3d at 307 ("[T]he resulting multiplier need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's analysis justifies the award."). It explained that similar or larger multipliers had been approved by other courts.[134] H-Add. 50; H-App.

---

[134]    *See Perez v. Rash Curtis & Assocs.*, No. 4:16-cv-03396-YGR, 2020 WL 1904533, at *20-21 (N.D. Cal. Apr. 17, 2020) (approving multiplier of 13.42 to 18.15, depending on future litigation hours), *remanded pursuant to settlement*, 2021 WL 4553023 (9th Cir. Aug. 23, 2021); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 4:16-cv-03396-YGR, 2009 WL 2408560, at *2 (D. Mass. 2009) (8.3 multiplier); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A. 03-4578, 2005 WL 1213926, at *16–18 (E.D. Pa. May 19, 2005) (15.6 multiplier); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 182 (D. Mass. 1998) (8.9 multiplier); *Muchnick v. First Fed. Sav. & Loan Ass'n of Phila.*, No. 4:16-cv-03396-YGR, 1986 WL 10791, at *1 (E.D. Pa. Sept. 30, 1986) (awarding fee of $250,000 where lodestar was approximately $30,000—a multiplier of 8.33); *In re Merry-Go-Round Enters. Inc.*, 244 B.R. 327, 335 (Bankr. D. Md. 2000) (19.6 multiplier for representation of chapter 7 trustee); *see also Farrell, N.A.*, 827 F. App'x at 630 (affirming district court's decision not to perform lodestar cross-check, even though multiplier was approximately 10, as noted by

1326; R. Doc. 235, at 38. And its justification for the multiplier tracks those given by other courts—namely, cases where class counsel expediently secured excellent outcomes for the benefit of the class. *See, e.g.*, *In re Mercedes-Benz Emissions Litig.*, No. 2:16-cv-881 (KM)(ESK), 2021 WL 7833193, at *15 (D.N.J. Aug. 2, 2021) ("[C]ourts in the Third Circuit recognize that larger settlements or earlier settlements can—and often do—produce higher multipliers."); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) (lower multiplier would "result in penalizing plaintiffs' counsel for achieving an early settlement").

According to Hampe, however, the district court's lodestar crosscheck was "deeply flawed," Hampe Br. 46, but her analysis ignores post-approval hours estimated by Class counsel, which appears to be how she produces a multiplier of 13. Hampe Br. 21; *see id.* at 28-29. She fails to explain why the hours should not be included. As the district court noted, a reasonable estimate of future hours is commonly included in a lodestar. H-Add. 49; H-App. 1325; R.Doc. 235, at 37 n.7 (collecting cases).

Ms. Pentz also argues the district court should not have considered

---

separate opinion). H-App. 776-77; R. Doc. 179-2, at 20-21 (citing numerous cases of similar multipliers).

post-approval hours for purposes of calculating the lodestar multiplier, because doing so effectively "subject[s]" the hours to a risk multiplier, even though they are "subject to zero risk." Pentz. Br. 10-11 (emphasis omitted). This approach, however, measures litigation risk at a time after the litigation is resolved. For litigation risk to be correctly gauged, it must be measured at the beginning of a case, not the end. *Synthroid*, 264 F.3d at 718 ("[H]indsight alters the perception of the suit's riskiness . . . ."). All circuits to address the matter have held that risk should be assessed "at the 'outset' of litigation." *Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997, 1009 (9th Cir. 2002) (collecting cases); *accord Goldberger*, 209 F.3d at 55; *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 583 (3d Cir. 1984).[135] If a multiplier is to accurately reflect litigation risk, the risk should be measured once—at the outset of the litigation—and not differently at different times.

---

[135] *In re Tremont Securities Law, State Law & Insurance Litig.*, 699 Fed. Appx. 8 (2d Cir. 2017) is not to the contrary. There, the district court approved a class settlement and awarded fees to lead counsel. Later, it awarded *additional* fees when it approved a plan of allocation. In awarding additional fees, the court applied a lodestar multiplier, citing the risk of bringing the underlying claims. The attorneys, however, were "already compensated for [this] risk" by the fees awarded at settlement approval. *Id.* at 17 (citing record). Here, by contrast, the district court did not award fees, or compensate for risk, twice.

Hampe next appears to suggest that any multiplier above 5.6 is an abuse of discretion. Hampe Br. 46-47. But while the Court has described a multiplier in that range as "high," *Rawa*, 934 F.3d at 870, it has never suggested a greater multiplier is unjustifiable. To the contrary, that sort of bright-line limit would be inconsistent with the application of the *Johnson* factors and the "significant discretion" afforded to district courts in this Circuit. *Life Time*, 847 F.3d at 623.

Hampe also attacks the multiplier as higher than those in other data-breach cases. Hampe Br. 47. But, as noted, Class counsel secured *better* relief more quickly (and therefore with less time expended), which the district court found had independent value to the Class. H-Add. 45; H-App. 1321; R. Doc. 235, at 33. Under these circumstances, the absence of a greater lodestar produced a *benefit*, not a detriment that deserves smaller compensation.

Finally, Hampe complains that Class counsel did not inundate the district court with volumes of itemized billing records. Hampe Br. 47. But time summaries, like those submitted below, are perfectly acceptable. *Genetically Modified Rice*, 764 F.3d at 871. And the district court found the hours billed and rates charged reasonable. H-Add. 49-50; H-App.

1325-26, R. Doc. 235, at 37-38. Hampe provides no basis to show clear error (or question the time summaries). Likewise, she fails to support her assertion that the hours submitted by non-lead counsel required separate affidavits, Hampe Br. 47, rather than a single authenticating affidavit.

## III. THE DISTRICT COURT PROPERLY REVOKED HAMPE'S COUNSEL'S *PRO HAC VICE* APPLICATIONS.

The final issue on appeal is whether the district court abused its discretion in revoking Clore's and West's temporary (*pro hac vice*) admission to practice in this underlying case. But the district court did not err because (as explained) they filed bad-faith objections.

The district court "has the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43 (citing *Ex parte Burr,* 9 Wheat. 529, 531 (1824)). That includes the power to "admit and suspend attorneys." *In re Snyder*, 472 U.S. 634, 645 n.6 (1985).

Hampe's reliance on *United States v. Gonzalez-Lopez*, 399 F.3d 924, 929 (8th Cir. 2005) is misplaced. That was a criminal case that implicated a defendant's Sixth Amendment right to counsel. *See id*. at 928-29. That right does not apply to civil cases[.]" *See, e.g.*, *Droste v. Julien*, 477 F.3d 1030, 1036 (8th Cir. 2007). Hampe fails to show any error.

**CONCLUSION**

The appeals should be dismissed, and the judgment of the district court should be affirmed.

Date: January 9, 2024

Respectfully submitted,

By: /s/ Norman E. Siegel

Norman E. Siegel
Bradley T. Wilders
STUEVE SIEGEL HANSON
460 Nichols Rd., Ste. 200
Kansas City, MO 64112
siegel@stuevesiegel.com

Cari Campen Laufenberg
Christopher Springer
KELLER ROHRBACK L.L.P.
1201 3rd Ave., Ste. 3200
Seattle, WA 98101
claufenberg@kellerrohrback.com

James J. Pizzirusso
Steven M. Nathan
HAUSFELD LLP
888 16th St. NW, Ste. 300
Washington, DC 20006
jpizzirusso@hausfeld.com

*Attorneys for Plaintiffs- Appellees*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE, AND TYPE STYLE AND CERTIFICATION THAT PDF IS VIRUS FREE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 15,341 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the type face requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Century Schoolbook, 14-point plain font.

Pursuant to Eighth Circuit Local Rule 28A(h), this brief has been converted into PDF format, and the undersigned certifies that this brief has been scanned for viruses and is virus-free.

Date: January 9, 2024                    */s/ Norman E. Siegel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system on January 9, 2024. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

Date:  January 9, 2024                    */s/ Norman E. Siegel*